**THE UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **THOMAS GUILFOILE,** | **CIVIL ACTION** |
| **Plaintiff,** | **NO. _____** |
| **v.** | **Demand for Trial by Jury** |
| **SHIELDS PHARMACY, LLC, UMASS MEMORIAL SHIELDS PHARMACY, LLC, SHIELDS PHARMACY EQUITY, LLC, SHIELDS SPECIALTY PHARMACY HOLDINGS, LLC, collectively d/b/a SHIELDS HEALTH SOLUTIONS, and JOHN M. SHIELDS, SR., a/k/a JACK SHIELDS, in his individual capacity,** | |
| **Defendants.** | |

## COMPLAINT

### NATURE OF THE ACTION

1.     Plaintiff Thomas Guilfoile is a seasoned management professional with 30 years of finance and operations experience.  After years of providing free advice and counsel to his then long-time friend, Jack Shields, with regard to Mr. Shields' family businesses, Mr. Guilfoile officially joined Shields Pharmacy, LLC and its affiliated entities ("the Company") as an unpaid consultant in April 2013 and then as President in August 2013.  In order to incentivize Mr. Guilfoile to join the Company, the parties entered into an employment agreement which granted Mr. Guilfoile, among other things, equity in the Company and a significant annual bonus. Thereafter, Mr. Guilfoile, in less than three years, transformed the Company from a startup with no profits into a $100 million system-wide revenue business with more than $15 million in annual profits.

1

2.      Despite Mr. Guilfoile's stellar performance, his employment was abruptly terminated after he raised several complaints to Mr. Shields regarding what he believed, in good faith, to be illegal business practices on the part of Mr. Shields, including violations of the Anti-Kickback Statute and fraud.  Rather than try to rectify these potentially illegal practices, Mr. Shields took swift punitive action by terminating Mr. Guilfoile's employment a mere *three days* before a significant portion of his equity was to vest.  Mr. Shields has since refused to properly compensate Mr. Guilfoile for any of the amounts owed under the employment agreement, depriving Mr. Guilfoile of millions of dollars in equity, distributions, and severance.

3.      Accordingly, Mr. Guilfoile now brings this action against Defendants, Shields Pharmacy, LLC, UMass Memorial Shields Pharmacy, LLC, Shields Pharmacy Equity, LLC, and Shields Specialty Pharmacy Holdings, LLC, which collectively do business as Shields Health Solutions, and individual Defendant Jack Shields for: (1) breach of contract; (2) declaratory judgment pursuant to M.G.L. Ch. 231A; (3) breach of the implied covenants of good faith and fair dealing; (4) violations of the False Claims Act, 31 U.S.C. § 3730(h) ("FCA"); (5) wrongful termination in violation of public policy; (6) breach of fiduciary duty; (7) intentional interference with advantageous contractual/business/employment relationships; and (8) failure to pay wages in violation of the Massachusetts Wage Act, M.G.L. Ch. 149 § 148.

4.      Mr. Guilfoile, in this action, seeks declaratory relief, compensatory damages, incidental damages, consequential damages, attorneys' fees and costs, and other appropriate legal and equitable relief pursuant to the FCA and Massachusetts law.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over Mr. Guilfoile's FCA claim pursuant to 28 U.S.C. § 1331.

6.      This Court has supplemental jurisdiction over Mr. Guilfoile's breach of contract, declaratory judgment, breach of the implied covenants of good faith and fair dealing, wrongful termination in violation of public policy, breach of fiduciary duty, intentional interference with advantageous contractual/business/employment relationships, and unpaid wages claims pursuant to 28 U.S.C. § 1367 because these claims are so closely related to Mr. Guilfoile's FCA claim that they form part of the same case or controversy under Article III of the United States Constitution.

7.      Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(b) because all Defendants are residents of this District and the matters complained of herein occurred within the District of Massachusetts.

## PARTIES

8.      Plaintiff Thomas Guilfoile is an individual residing in Duxbury, Massachusetts and the former President of the Company.

9.      Defendant Shields Pharmacy, LLC is a company incorporated under the laws of the Commonwealth of Massachusetts with its principal place of business in Quincy, Massachusetts.

10.     Defendant UMass Memorial Shields Pharmacy, LLC is a joint venture between Defendant Shields Pharmacy, LLC and UMass Memorial Health Ventures, Inc., and is incorporated under the laws of the Commonwealth of Massachusetts with its principal place of business in Quincy, Massachusetts.

11.     Defendant Shields Pharmacy Equity, LLC is a company incorporated under the laws of the State of Delaware with its principal place of business in Quincy, Massachusetts.

12.     Defendant Shields Specialty Pharmacy Holdings, LLC is a joint venture between Defendant Shields Pharmacy Equity, LLC and UMass Memorial Health Ventures, Inc., and is incorporated under the laws of the State of Delaware with its principal place of business in Quincy, Massachusetts.

13.     Upon information and belief, as of on or about December 29, 2015, Defendants possessed ownership interests in the following entities: Shields Pharmacy of Greater Springfield, LLC; Shields Pharmacy of Newark, LLC; Shields Pharmacy of University, LLC; Shields Pharmacy of Camden, LLC; Shields Pharmacy of Hartford, LLC; Shields Pharmacy of Berkshire, LLC; Shields Pharmacy of Providence, LLC; Shields Pharmacy of Dallas, LLC; Shields Health Management Company, LLC; Shields Specialty Pharmacy of Springfield, LLC; and Shields Care Management of Worcester, LLC.

14.     Upon information and belief, as of on or about January 1, 2016, Defendants reorganized so as to consolidate the entities identified in the previous paragraph – with the exception of Shields Care Management of Worcester, LLC – under Defendant Shields Specialty Pharmacy Holdings, LLC.[1]

15.     Defendant Jack Shields is an individual residing in Duxbury, Massachusetts and is the CEO of the Company.

16.     At all relevant times, Mr. Guilfoile was an "employee" of the Company for the purposes of the FCA and Massachusetts law.

---

[1] Defendant Shields Specialty Pharmacy Holdings, LLC was originally incorporated in August 2014 so as to effectuate a corporate reorganization which did not ultimately occur until on or about January 1, 2016, after Mr. Guilfoile's employment was terminated.

## FACTUAL ALLEGATIONS

**Background Information**

17.     The Company, which is presently known as Shields Health Solutions, partners with hospitals to provide specialty pharmacy and other related services.  Specialty pharmacy services focus on chronically ill patients who require specialized treatments and medications. These specialized treatments and medications differ from typical treatments and medications in that they require strict adherence, are administered via complicated regimens, and are generally very expensive.  The hospitals that partner with Shields Health Solutions either contract with outside pharmacies for medication fulfillment or provide specialty pharmacy centers on-site which the Company staffs and administers.  The Company then processes the prescription of specialized treatments and medications and follows up with patients so as to ensure adherence. The Company also, on occasion, provides its patients with financial advice relative to these specialized treatments and medications.  Finally, the Company maintains home infusion and high-risk care management programs as secondary lines of business.

18.     At the time Mr. Guilfoile joined the Company, Mr. Shields and Mr. Guilfoile had been friends and neighbors for nearly 20 years.

19.     Prior to joining the Company, Mr. Shields had frequently asked Mr. Guilfoile for advice and assistance with respect to various business ventures.

20.     For example, in or around 2008, Mr. Shields and his father, Tom Shields, Sr., sought Mr. Guilfoile's advice and representation in selling the family business.

21.     In or around 2011 or 2012, Mr. Shields asked Mr. Guilfoile for advice with respect to starting a new business venture related to specialty pharmacy services.

22.     In 2012, Mr. Shields founded Shields Pharmacy, LLC ("Shields Pharmacy").

23.     Shields Pharmacy initially partnered with UMass Memorial Health Ventures, Inc. ("UMHV") in a 50-50 joint venture called UMass Memorial Shields Pharmacy, LLC ("UMSP") for the purpose of operating a specialty pharmacy on UMass Memorial Medical Center's campus.

24.     Due to the success of the original joint venture, the parties decided to branch out and create additional joint ventures with other hospitals in Massachusetts and around the country.

25.     These additional joint ventures and the original operated as a common enterprise, shared a headquarters, a website, and core administrative staff, and would later collectively do business as Shields Health Solutions.

26.     However, throughout Mr. Guilfoile's tenure, the Company was always referred to as having two sides, the "UMass side" referencing all UMass Memorial Medical Center-related business, and the "non-UMass side" referencing the Company's business with all other medical centers (often referred to as "holdings").

27.     After a strong start, the Company's growth in the first quarter of 2013 became stagnant.

28.     In April 2013, Mr. Shields asked Mr. Guilfoile to consult for the Company with respect to building out infrastructure in order to support renewed growth and scalability.

29.     Mr. Guilfoile agreed and consulted for the Company full-time without pay from April to August 2013, developing a strategic plan and building out infrastructure which spurred strong growth during the second and third quarters of 2013.

**Mr. Guilfoile Joins the Company as President**

30.     As a result of the Company's renewed success during the second and third quarters of 2013, Mr. Shields, in August 2013, asked Mr. Guilfoile to join the Company full-time as President of Shields Pharmacy and all joint ventures.

31.     Mr. Guilfoile agreed, and in or around August 2013, Mr. Guilfoile and Mr. Shields, on behalf of the Company, executed an Employment Term Sheet ("Term Sheet") governing the terms and conditions of Mr. Guilfoile's employment.

32.     During all relevant times thereafter, Mr. Guilfoile was an employee of the Company and Mr. Shields was his immediate supervisor.

33.     As President, Mr. Guilfoile was responsible for the executive leadership of the Company and served as one of its four board members.

34.     Mr. Shields, following Mr. Guilfoile's hiring as President, generally had limited involvement in the Company's business operations other than with respect to business development.

35.     The Term Sheet provided that Mr. Guilfoile's compensation as President was to be primarily incentive-based, with an annual salary of $275,000 and an annual bonus of 10% of annual profit (defined as earnings before interest, taxes, depreciation and amortization ("EBITDA")) which would decrease to 5% over time while Mr. Guilfoile's equity in Shields Pharmacy rose to 10%.[2]

###########################################

[2] It would later become apparent to Mr. Shields and Mr. Guilfoile that there had been a misunderstanding as to the interests identified in the Term Sheet and they would clarify that the percentages referenced therein referred to Mr. Shields' 50% stake and not UMHV's interest (*i.e.* the annual bonus and equity interests referred to in the Term Sheet were actually half of what Mr. Guilfoile understood them to be).

36.     The Term Sheet also provided that Mr. Guilfoile would receive a 12.5% equity stake in any joint venture or business of the Company separate and apart from Shields Pharmacy's initial joint venture with UMHV (*i.e.* joint ventures in non-UMass businesses).

37.     The 10% equity interest in Shields Pharmacy and 12.5% equity interest in other business ventures were to be structured as "profits interests under the Internal Revenue Code."

38.     More specifically, the Term Sheet provided that Mr. Guilfoile's annual bonus would decrease to 7.5% of EBITDA upon the Company obtaining $50 million in annual system-wide revenues, and decrease to 5% of EBITDA upon the Company obtaining $100 million in annual system-wide revenues.

39.     At the same time, Mr. Guilfoile's equity stakes in Shields Pharmacy and in other business ventures would vest pursuant to (1) performance-based goals and (2) time in service.

40.     With respect to performance-based goals, 2.5% of the equity would vest upon the Company obtaining $50 million in annual system-wide revenues, and an additional 2.5% of the equity would vest upon the Company obtaining $100 million in annual system-wide revenues (for a total of 5%).

41.     With respect to time in service, 5% of Mr. Guilfoile's equity stake in Shields Pharmacy and 7.5% of his equity stake in other business ventures would vest quarterly over a three-year period.

42.     Finally, the Term Sheet provided that Mr. Guilfoile was entitled to "12 months severance (and including already fully vested ownership) upon *any termination of employment other than voluntary termination by Mr. Guilfoile*."

8

43.     The parties, at the time they executed the Term Sheet, agreed that Defendants would repurchase Mr. Guilfoile's "already fully vested ownership" in the event of any termination other than voluntary resignation.

**Mr. Guilfoile and Mr. Shields Modify the Terms of Mr. Guilfoile's Employment Agreement**

44.     In 2014, it became clear to Mr. Shields and Mr. Guilfoile that there had been a fundamental misunderstanding as to the Term Sheet.

45.     Whereas Mr. Guilfoile had understood the aforementioned equity stakes to refer to UMSP and other business ventures as a whole, Mr. Shields insisted that they pertained solely to Mr. Shields' 50% stake in those entities.

46.     Acknowledging this misunderstanding, Mr. Shields, acting on Defendants' behalf, agreed to modify and restate the terms of Mr. Guilfoile's employment with Defendants.

47.      Specifically, in an October 7, 2014 email, Mr. Shields stated that, "[i]n an effort to avoid any further misunderstanding, [Mr. Shields] found it important to clearly outline [Mr. Guilfoile's] compensation package."

48.     Mr. Shields "propos[ed] the [Term Sheet] from last year as [he] understood it with the potential opportunity of converting the holdings' incentive compensation to additional equity based on certain milestones and other considerations described later in the memorandum."

49.     More specifically, Mr. Shields presented Mr. Guilfoile with the following offer:

a.      Mr. Guilfoile's title and salary would remain as outlined in the August 2013 Term Sheet.

b.      Mr. Guilfoile would remain a member of the board of the Company and all joint ventures that had separate boards.

    c.      Mr. Guilfoile's annual bonus would continue to be paid pursuant to the terms outlined in the August 2013 Term Sheet.

    d.      Mr. Guilfoile would continue to receive equity in Shields Pharmacy and in other business ventures pursuant to the terms outlined in the August 2013 Term Sheet, except that Mr. Shields clarified that Mr. Guilfoile's 10% equity stake in Shields Pharmacy and 12.5% equity stake in other business ventures pertained to Mr. Shields' 50% stake (*i.e.* they did not pertain to UMHV's 50% stake).

    e.      Mr. Guilfoile would receive cash distributions on the vested portions of his equity as well as deferred cash distributions on the unvested portions of his equity throughout the duration of the agreement.

    f.      Mr. Guilfoile would receive 12 months' severance and the Company would repurchase his already fully vested equity in the event of any termination other than voluntary resignation as outlined in the August 2013 Term Sheet.

50.    Notably, in presenting this offer to Mr. Guilfoile, Mr. Shields stated in his October 7, 2014 email: "[t]he compensation package has only gotten more attractive in [Mr. Shields'] opinion – *unanticipated cash distributions, deferral of cash distributions on unvested shares, no hurdle rates on buyout and holding company ownership structure*."

51.    Mr. Guilfoile responded to Mr. Shields' October 7, 2014 email and agreed to all the terms, but requested that the 12.5% equity stake in other business ventures be raised to 15%.

52.    Very shortly thereafter, Mr. Guilfoile and Mr. Shields discussed the offer and agreed to the modified terms including the 15% equity stake in other business ventures.

53.     Accordingly, the vesting schedule with respect to other business ventures was revised as follows: 3% of the equity would vest upon the Company obtaining $50 million in annual system-wide revenues; 3% of the equity would vest upon the Company obtaining $100 million in annual system-wide revenues; and 9% of the equity would vest quarterly over a three-year period.

54.     Mr. Guilfoile and Mr. Shields confirmed Mr. Guilfoile's acceptance of the modified agreement and Mr. Guilfoile continued working for the Defendants as President.

**The Company Reorganizes and Creates a Profits Interests Pool for Non-UMass Related Business which does not go into Effect until After Mr. Guilfoile's Employment is Terminated**

55.     Around the same time as the terms of Mr. Guilfoile's employment were being modified, Mr. Guilfoile advised Mr. Shields to create a more simplified, two-company organizational structure.

56.     Specifically, Mr. Guilfoile officially proposed dividing the Company between: (1) all UMass-related business, including the original joint venture with UMHV (*i.e.* UMSP); and (2) all joint ventures or business of the Company separate and apart from UMass, which was to eventually be reorganized under Defendant Shields Specialty Pharmacy Holdings, LLC ("Holdings").

57.     Further, Mr. Guilfoile proposed a profits interests program for the non-UMass side of the Company wherein the Company would create a profits interests pool in non-UMass related business and grant employees equity interests from the pool.

58.     Mr. Guilfoile proposed and advocated for the pool with respect to non-UMass related business as he wished to create a mechanism whereby he could recruit and retain top management and executive level talent.

59.     Mr. Shields was adamant that such a restructuring keep the UMass-related business separate and apart from the non-UMass related business and that the pool for employees _not_ include UMass-related business.  Mr. Guilfoile agreed.

60.     So as to incentivize Mr. Shields and the Board of Directors to create the pool in non-UMass related business and in consideration of such, Mr. Guilfoile agreed to convert his 15% equity stake in Mr. Shields' 50% interest in non-UMass related business into a 7.5% profits interest in the pool once the reorganization was effectuated.  This was a significant sacrifice by Mr. Guilfoile, solely for the good of the Company, as it would require him to relinquish his unencumbered interest and substantial rights (_i.e._ deferral of cash distributions on unvested shares, no hurdle rates, etc.) in exchange for profits interests in the pool which would carry significant restrictions and hurdles.

61.     The profits interests pool was only ever intended to be applied to the non-UMass related business side of the Company.

62.     Mr. Guilfoile never contemplated nor spoke with anyone about creating a profits interests pool with respect to Shields Pharmacy or UMSP nor did the Board of Directors ever approve such a plan.

63.     Mr. Guilfoile never agreed that the restrictive terms or hurdles of the Holdings profits interests pool would be applicable to Shields Pharmacy or UMSP nor did he ever execute any agreement effectuating the same.

64.     In or around August 2014, Mr. Guilfoile and Mr. Shields presented the proposed reorganization and profits interests pool with respect to non-UMass related business to the Company's Board of Directors and then to the UMHV Board of Trustees.

65.     The UMHV Board of Trustees initially approved the reorganization and the creation of a 30% profits interests pool with respect to non-UMass related business.  The Board gave the Company the go-ahead to retain a law firm to draft the necessary documentation so as to effectuate the reorganization under Holdings and to create the profits interests pool.

66.     Around the same time, the Company created Shields Pharmacy Equity, LLC, the entity which, upon information and belief, held Mr. Shields', Mr. Guilfoile's, and other employees' ownership interests in non-UMass related business and which would eventually hold their profits interests in the Holdings pool.

67.     In or around December 2014, the Company's Board of Directors approved initial grants in the Holdings profits interests pool to various employees, including Mr. Guilfoile's 7.5% grant.

68.     Around the same time, CFO John Lucey approached Mr. Guilfoile and requested a revision to the equity vesting schedule with respect to the time-based portion thereof.  Mr. Lucey requested such an accommodation for recordkeeping simplification because the K-1s for 2013 had already been issued, distributions for 2014 had already been made, and the hurdle rate on profits interests in the Holdings pool was to be calculated as of January 1, 2014.

69.     Rather than vest quarterly, Mr. Guilfoile agreed that subject to the reorganization being effectuated and the Holdings profits interests pool being established, the time in service equity would vest over the course of three years with one-third vesting as of January 1, 2015, one-third vesting as of January 1, 2016, and one-third vesting as of January 1, 2017.  Upon information and belief, Mr. Lucey, who also possessed equity interests in Shields Pharmacy and non-UMass related business, obtained Mr. Shields' approval in order to eventually effectuate this change.

70.     The Company retained Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C. ("Mintz Levin") to effectuate the necessary documentation for the reorganization and the creation of the Holdings profits interests pool.

71.     In order to maximize protection from a potential unrelated legal matter relating to a former employee who was in breach of various restrictive covenants, the Company decided to create a more complicated corporate structure which would allow it to grant equity not only in Holdings but also in each individual Holdings subsidiary for the sole purpose of preempting any right in Holdings by the former employee.

72.     The revised proposed reorganization and corresponding legal documentation was presented to UMHV legal counsel who expressed serious concerns as to the new structure which deviated from the initial approval of a profits interests pool with respect to a single entity, Holdings.

73.     A UMHV Board of Trustees representative, Cheryl Lapriore, Senior Vice President and Chief of Staff at UMass Memorial Health Care, Inc., called Mr. Guilfoile to express her disappointment that the revised proposal did not reflect what the UMHV Board had originally agreed to back in August 2014.

74.     Mr. Guilfoile explained that the revision was made for the sole purpose to protect against a potential legal challenge by the former employee should he attempt to claim an equity interest in Holdings once the reorganization took effect.

75.     As a result of this corporate change, Ms. Lapriore informed Mr. Guilfoile that the UMHV Board of Trustees would have to re-vote on this revised structure at its next board meeting scheduled for December 21, 2015.

76.     The UMHV Board of Trustees, at the December 21, 2015 meeting, approved the revised structure and profits interests pool in Holdings with an expected, effective start date of January 1, 2016.

77.     As of this Complaint, Mr. Guilfoile does not know if the necessary legal documentation effectuating the reorganization and profits interests pool in Holdings was ever finalized or executed.

78.     Mr. Guilfoile was terminated on December 29, 2015, prior to the effective date of the reorganization and the creation of the profits interests pool rendering his participation in the pool void and leaving Mr. Guilfoile, pursuant to the October 2014 employment agreement, a fully-vested 8.75% stake in Shields Pharmacy and a fully-vested 12.75% stake in Mr. Shields' 50% interest in all non-UMass related business, which Mr. Guilfoile owned outright and unencumbered as of the date of his termination.

79.     Upon information and belief, Mr. Guilfoile, as of the date of his termination, and by virtue of his ownership interests in Defendants, possessed corresponding ownership interests in the following entities: Shields Pharmacy of Greater Springfield, LLC; Shields Pharmacy of Newark, LLC; Shields Pharmacy of University, LLC; Shields Pharmacy of Camden, LLC; Shields Pharmacy of Hartford, LLC; Shields Pharmacy of Berkshire, LLC; Shields Pharmacy of Providence, LLC; Shields Pharmacy of Dallas, LLC; Shields Health Management Company, LLC; Shields Specialty Pharmacy of Springfield, LLC; and Shields Care Management of Worcester, LLC.

**The Company is Exceptionally Successful During Mr. Guilfoile's Tenure as President**

80.     In 2012, the Company's system-wide revenue was approximately $1 million and its EBITDA was less than $0.

81.     In 2013, the Company's system-wide revenue was approximately $25 million and its EBITDA was approximately $500,000.

82.     In 2014, the Company's system-wide revenue was approximately $52 million and its EBITDA was approximately $10 million.

83.     In 2015, the Company's system-wide revenue was approximately $105 million and its EBITDA was approximately $15 million.

84.     In other words, in less than three years, the Company, under Mr. Guilfoile's leadership, grew from a start-up to a business generating more than $100 million in system-wide revenue and $15 million in profit.

85.     As a result of Mr. Guilfoile's leadership, Mr. Shields and UMHV each received or were eligible to receive in excess of $10 million in distributions respectively over a three-year period.

86.     At the same time, the Company enjoyed incredible customer and employee satisfaction.

87.     Patient and provider satisfaction was consistently around 99% each year.

88.     Employee satisfaction ratings were equally incredible.   In December 2015, employee satisfaction survey results relative to employees Company-wide reflected: 90.8% of employees felt supported; 93.8% of employees were proud to be working for the Company; 93.8% of the employees felt inspired by their work; 95.4% of the employees felt the work they did was meaningful; and 98.7% of the employees felt their work was having an impact.

89.     From April 2013 to September 2015, Mr. Shields, UMass Memorial Medical Center executive leadership, and the Board of Directors frequently expressed to Mr. Guilfoile how thankful they were for his leadership.

**Mr. Guilfoile Complains to Mr. Shields Regarding What He Reasonably Believed to be Violations of the Law**

90.     During his time with the Company, Mr. Guilfoile became increasingly concerned about Mr. Shields' questionable business practices including, but not necessarily limited to, his use of a private plane and a personal pilot for Company business and his use of Company employees for personal or other business.

91.     In the Fall of 2015, Mr. Guilfoile learned several things about Mr. Shields in a very short period of time which caused him to believe that Mr. Shields' conduct had finally crossed the line from questionable business practices into potential violations of law.

92.     Specifically, in or around October 2015, Mr. Guilfoile learned that Mr. Shields, on the Company's behalf, had previously entered into a contract with Michael Green, a long-time friend of Mr. Shields and a paid consultant for several New Jersey hospitals.

93.     The contract obligated the Company to, among other things, pay Mr. Green's consulting firm, Ayrault Group, $35,000 per quarter for each hospital contract that Mr. Green successfully referred to the Company.

94.     Specifically mentioned in the contract were two hospitals with whom Mr. Green was working as a paid consultant: Newark Beth Israel Medical Center ("NBIMC") and University Hospital ("University"), both of Newark, New Jersey.

95.     The Company, with assistance from Mr. Green, entered into contracts for specialty pharmacy services with both NBIMC and University.

96.     Upon information and belief, Mr. Green advised the Company to price the NBIMC contract bid below a specific threshold so as to avoid NBIMC opening up the contract to bids by other vendors.

97.     By paying Mr. Green to help secure contracts with hospitals which were already paying Mr. Green, Mr. Guilfoile believed that Mr. Shields had created a conflict of interest, but, more disturbing, was Mr. Guilfoile's belief that this arrangement meant the Company was engaged in an illegal kickback scheme and potentially violated the Federal Anti-Kickback Statute.

98.     The Federal Anti-Kickback Statute prohibits the exchange of or offer to exchange anything of value in an effort to induce or reward the referral of federal health care program business.

99.     Mr. Guilfoile believed that because the contract called for payments to Ayrault Group for referrals to hospitals that were paying clients of Mr. Green's, that this exposed the Company to significant liability.

100.    Mr. Guilfoile conferred with the Company's counsel, Thomas Montminy, who assessed the matter and agreed that Mr. Guilfoile's legal concerns with respect to the Ayrault Group contract were valid.

101.    Out of respect for their long-standing personal and professional relationship, Mr. Guilfoile decided to approach Mr. Shields directly, rather than the Board of Directors, in an attempt to find a resolution to the situation.

102.    He notified Mr. Shields in October 2015 that he believed the contract violated the law.

103.    Mr. Guilfoile suggested that the Company had three options: (1) require Mr. Green to disclose the existence of the contract to the respective New Jersey hospitals and get them to acknowledge that the contract did not create a conflict of interest or violate federal law; (2) the Company could self-report the existence of the contract with Ayrault Group directly to

NBIMC and University; or (3) the Company could void the contract and seek the return of monies paid.

104.    In response, Mr. Shields insisted that Mr. Green had represented to him that his contract with the Company did not violate his contract with the hospitals and therefore refused options one or two of Mr. Guilfoile's proposal because it would, in effect, be calling Mr. Green "a liar."  However, at Mr. Guilfoile's insistence, Mr. Shields did agree to approach Mr. Green regarding option three.

105.    After an apparent negotiation, Mr. Shields revealed that Mr. Green had agreed to void the payments required under the contract for the University referral but refused to return the monies paid to him for the NBIMC referral.  Mr. Shields contended that this was an appropriate resolution because the contract between the Company and NBIMC was no longer active and as a result, "no one would ever question it."

106.    Mr. Guilfoile vehemently disagreed and insisted that they reveal the matter to the Board of Directors, as the contract placed the Company at substantial risk and was a disclosable offense which required transparency with the Board.

107.    Mr. Guilfoile, during his conversations with Mr. Shields, even suggested they disclose the matter together as a sign of solidarity.

108.    Mr. Shields, however, refused to elevate the matter to the attention of the Board of Directors.

109.    Shortly thereafter, in November 2015, Mr. Guilfoile discovered that Robbie Greenglass, the Company's Director of Business Development, was working for Mr. Shields in another capacity helping him secure private equity investments for the benefit of Mr. Shields and another business partner.

110.    Mr. Greenglass was hired in June 2014 solely for the purpose of securing new business relationships for the Company.

111.    Mr. Greenglass acknowledged to Mr. Guilfoile that while being employed by the Company over the previous 18 months he had helped Mr. Shields make approximately a dozen private equity investments for the financial benefit of Mr. Shields, Mr. Greenglass, and another business partner.

112.    Further, Mr. Greenglass revealed that during this time he had also been actively raising additional private equity capital from outside investors for a new venture capital fund to be managed by Mr. Shields, Mr. Greenglass, and their other business partner, which they had already established and named "Waterline Ventures."   Mr. Greenglass further stated that this fundraising effort was nearing completion and he expected to close on the financing in "early 2016."

113.    Upon information and belief, Mr. Shields and Mr. Greenglass, from time-to-time, conducted Waterline Ventures business while on business trips paid for by the Company.

114.    Mr. Guilfoile believed that Mr. Shields' conduct was tantamount to fraud on the shareholders, including, but not necessarily limited to, UMHV and Mr. Guilfoile, as the Company's assets and resources were being diverted from the Company for Mr. Shields' personal financial gain.

115.    Mr. Guilfoile, in November 2015, approached Mr. Shields and vehemently opposed what he reasonably believed to be fraudulent conduct with respect to Mr. Greenglass.

116.    He proposed that the Company reclassify Mr. Greenglass as part-time and accelerate a search for a Vice President of Business Development.

117.   Mr. Guilfoile also insisted that they inform the Board of Directors of the matter and Mr. Shields again refused.

118.   Finally, in December 2015, Mr. Guilfoile learned from Mr. Greenglass that a proposed contract between the Company and Care New England Health System ("CNE") of Providence, Rhode Island had not been reviewed by the Company's counsel.

119.   In fact, Mr. Guilfoile learned from Mr. Greenglass that none of the contracts Mr. Shields and Mr. Greenglass had worked on had been reviewed by the Company's counsel.

120.   In addition to CNE, UMass Memorial Medical Center, NBIMC, and University, the Company also had contracts with the following hospitals: Baystate Medical Center; Hartford Hospital; Christus Health; Cooper University Hospital; and Berkshire Medical Center.

121.   Far more disturbing to Mr. Guilfoile was the fact that the contract at issue, as well as several others, contained a false representation by the Company that it maintained "a fully staffed 24/7 Call Center in Quincy Massachusetts."

122.   The Company, at the time, did not have a fully-staffed 24/7 Call Center in Quincy, Massachusetts.

123.   Despite Mr. Guilfoile's insistence that this representation be modified to reflect the truth, Mr. Shields signed this and other contracts on the Company's behalf knowing full-well that this representation contained therein was false.

124.   Mr. Guilfoile believed that making false representations to a non-profit hospital relating to the provision of *vital medication management services to chronically ill patients with serious medical conditions* was not only a serious breach of medical ethics but also posed a serious threat to public health and safety and violated the law.

125.    Accordingly, Mr. Guilfoile, as he had done in October and November, approached Mr. Shields with a plan to rectify the potentially illegal actions by recommending that the Company either amend the contracts to remove the representation or build a fully-staffed 24/7 Call Center so as to meet the contractual obligations.

126.    Mr. Shields refused, suggesting that the Company should wait until a customer realized the breach and then address the issue.

127.    He also refused Mr. Guilfoile's request that they notify the Board of Directors.

**Mr. Shields Retaliates against Mr. Guilfoile by Terminating his Employment**

128.    Mr. Shields, over the course of October, November, and December 2015, became increasingly concerned that Mr. Guilfoile would independently go the Board and disclose Mr. Shields' potential violations of law.

129.    On December 22, 2015, Mr. Shields asked Mr. Guilfoile to come to his home office and expressed, among other things, his concern about Mr. Guilfoile "going over his head" and "airing his dirty laundry" to the Board of Directors.

130.    Mr. Shields told Mr. Guilfoile that he viewed the Board of Directors and UMass management as the "third rail" and that he was concerned that Mr. Guilfoile was getting too close to the "third rail."

131.    Mr. Shields also explained that he felt he "had to protect his interests and his family" and that he could not risk a "3-to-1" vote by the Board of Directors against him. Moreover, he couldn't risk his business relationship with UMass given that he anticipated additional partnerships with UMass in the future.

132.    Mr. Shields then suggested that the two of them consider "parting ways."

133.     Mr. Guilfoile responded that "parting ways" was ridiculous, that the two of them could work things out together, and reiterated that he had never threatened to go to the Board of Directors alone but rather had always suggested they do so together as a sign of solidarity.

134.     The December 22, 2015 meeting ended with no concrete resolution.  Instead, Mr. Shields stated that he would give the matter some additional thought.

135.     A week later, on December 28, 2015, Mr. Shields called Mr. Guilfoile and said he had thought it over and had decided to terminate their relationship.  He provided no explanation as to why he was terminating Mr. Guilfoile's employment.

136.     The following day, Mr. Shields emailed Mr. Guilfoile and confirmed that his employment was terminated.  Again, no reason was provided and there was no reference to either performance or misconduct as the basis for the termination since no such basis existed.

137.     Notably, the December 29, 2015 termination occurred approximately two months after Mr. Guilfoile first disclosed what he believed were Mr. Shields' violations of law, one week after Mr. Shields expressed grave concerns about Mr. Guilfoile revealing such matters to the Board of Directors, and just *three days* prior to January 1, 2016, the effective date of the corporate reorganization and the date additional tranches of Mr. Guilfoile's equity would have vested.

138.     Additionally, the December 29, 2015 written termination notice stated that Mr. Guilfoile's termination was retroactive to December 22, 2015, yet the Company failed to compensate Mr. Guilfoile for days worked from December 23 to December 29, 2015.

139.     Mr. Guilfoile, after his termination, notified Alice Shakman, Company Board Member and Senior Vice President, Operations of UMass Memorial Medical Center, that Mr. Shields had terminated his employment because of his fear that Mr. Guilfoile would report the

aforementioned potential violations of law to the entire Board.   Subsequently, Mr. Guilfoile forwarded to the Company's full Board of Directors a letter memorializing his concerns.

140.    Following Mr. Guilfoile's disclosures to the Board of Directors, Mr. Shields made repeated threats to file suit against Mr. Guilfoile for defamation and tortious interference.

141.    Mr. Guilfoile, at present, calculates that as of December 29, 2015, he owned a fully-vested 8.75% stake in Shields Pharmacy and a fully-vested 12.75% stake in Mr. Shields' 50% interest in all non-UMass related business.

142.    Specifically, with respect to Shields Pharmacy, Mr. Guilfoile had vested: 2.5% in performance-based equity for the Company obtaining $50 million in system-wide revenue in 2014; 2.5% in performance-based equity for the Company obtaining $100 million in system-wide revenue in 2015; and 3.75% in time in service equity due to Mr. Guilfoile having worked for the Company for at least nine quarters during the previous three years.

143.    With respect to non-UMass related business, Mr. Guilfoile had vested: 3% in performance-based equity for the Company obtaining $50 million in system-wide revenue in 2014; 3% in performance-based equity for the Company obtaining $100 million in system-wide revenue in 2015; and 6.75% in time in service equity due to Mr. Guilfoile having worked for the Company for at least nine quarters during the previous three years.

144.    On February 26, 2016, John M. Pomerance of Mintz Levin sent Mr. Guilfoile an "Incentive Interest Buyback Notice" which relied upon 15 different inapplicable incentive interest agreements and which stated, for the first time, that Mr. Guilfoile's employment had been "terminated for cause, including but not limited to, fraud, gross misconduct, gross negligence, insubordination and dishonesty," thus triggering the Company's right, pursuant to

the inapplicable incentive interest agreements, to repurchase Mr. Guilfoile's vested equity for the amount of $15.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### (Breach of Contract)
### (Against All Defendants Except Jack Shields)

**Failure to Pay Severance**

145.    Mr. Guilfoile realleges and incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

146.    Under Mr. Guilfoile's August 2013 Term Sheet, as modified by the October 2014 agreement, he is entitled to 12 months' severance in the event of "*any termination* of employment other than voluntary termination by Mr. Guilfoile."

147.    On December 29, 2015, Mr. Guilfoile's employment was involuntarily terminated.

148.    As of this Complaint, Defendants have failed to pay Mr. Guilfoile 12 months' severance, thereby breaching their obligations under the October 2014 modified employment agreement.

149.    As a direct and proximate result, Mr. Guilfoile suffered and continues to suffer damages including, but not necessarily limited to, significant lost compensation with respect to a severance payment.

**Failure to Pay Equity**

150.    Mr. Guilfoile realleges and incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

151.    The August 2013 Term Sheet stated that Mr. Guilfoile, in the event of "any termination of employment other than voluntary termination by Mr. Guilfoile", would receive his "*already fully vested ownership*."

152.    The October 2014 modified employment agreement provided that Mr. Guilfoile would receive equity in Shields Pharmacy and all non-UMass related business.

153.    On December 29, 2015, Mr. Guilfoile's employment was involuntarily terminated.

154.    As of December 29, 2015, Mr. Guilfoile owned outright and without restriction, a fully-vested 8.75% of Shields Pharmacy and a fully-vested 12.75% of Mr. Shields' 50% stake in all non-UMass related business.

155.    On February 26, 2016, Mintz Levin notified Mr. Guilfoile that the Defendants were exercising their purported right to repurchase Mr. Guilfoile's vested equity for the amount of $15.

156.    Defendants' $15 calculation was based upon inapplicable incentive interest agreements and a meritless, after-the-fact termination for cause, and therefore breached the October 2014 modified employment agreement.

157.    As a direct and proximate result, Mr. Guilfoile suffered and continues to suffer damages including, but not necessarily limited to, significant lost compensation with respect to the vested equity.

**Failure to Pay Full Distributions on Vested Equity**

158.    Mr. Guilfoile realleges and incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

159.     The October 2014 modified employment agreement provided that Mr. Guilfoile would receive annual distributions on his vested equity in Shields Pharmacy and all non-UMass related business.

160.     The Company failed to pay Mr. Guilfoile full and accurate distributions with respect to his vested equity for the years 2013, 2014, and 2015, thereby breaching the October 2014 modified employment agreement.

161.     As a direct and proximate result, Mr. Guilfoile suffered and continues to suffer damages including, but not necessarily limited to, significant lost compensation with respect to distributions on vested equity.

**Failure to Pay Full Distributions on Unvested Equity**

162.     Mr. Guilfoile realleges and incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

163.     The October 2014 modified employment agreement provided that Mr. Guilfoile would receive deferred distributions on his accrued but unvested equity in Shields Pharmacy and all non-UMass related business.

164.     Mr. Shields specifically stated in his October 7, 2014 email that Mr. Guilfoile would receive "cash distributions on unvested shares."

165.     The Company failed to pay Mr. Guilfoile full and accurate distributions on his accrued but unvested equity for the years 2013, 2014, and 2015, thereby breaching the October 2014 modified employment agreement.

166.     As a direct and proximate result, Mr. Guilfoile suffered and continues to suffer damages including, but not necessarily limited to, significant lost compensation with respect to distributions on unvested equity.

## SECOND CLAIM FOR RELIEF
### (Declaratory Judgment, M.G.L. Ch. 231A)
### (Against All Defendants Except Jack Shields)

167.    Mr. Guilfoile realleges and incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

168.    An actual, present, and justiciable controversy has arisen between Mr. Guilfoile and Defendants concerning Mr. Guilfoile's continued ownership in the relevant entities based on his vested equity interests because Defendants have attempted to enforce an "Incentive Interest Buyback Notice" that would improperly devalue Mr. Guilfoile's equity interests to a mere $15.

169.    Mr. Guilfoile seeks a declaratory judgment from this Court that he owns outright and without restriction a fully-vested 8.75% of Shields Pharmacy and a fully-vested 12.75% of Mr. Shields' 50% stake in all non-UMass related business, as well as any other equity already vested.

## THIRD CLAIM FOR RELIEF
### (Breach of the Covenants of Good Faith and Fair Dealing)
### (AGAINST ALL DEFENDANTS EXCEPT JACK SHIELDS)

170.    Mr. Guilfoile realleges and incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

171.    The October 2014 modified employment agreement provided, among other things, that Mr. Guilfoile would vest additional equity in Shields Pharmacy and in all non-UMass related business on January 1, 2016.

172.    On December 29, 2015, Mr. Guilfoile's employment was terminated in bad faith and/or without good cause, with the intention of, or resulting in, the deprivation of equity about to be due for his past services of employment.

173.    The termination has resulted in a financial windfall to the Defendants.

174.    Defendants' termination of Mr. Guilfoile's employment breached the implied covenants of good faith and fair dealing.

175.    Defendants also breached the covenants of good faith and fair dealing by, among other things, trumping up an after-the-fact "cause" basis for Mr. Guilfoile's termination in an effort to deprive him of obligations and amounts owed to him by the Defendants under the October 2014 modified employment agreement, and otherwise by not providing Mr. Guilfoile an opportunity to respond to such allegations prior to his termination.

176.    As a direct and proximate result, Mr. Guilfoile suffered and continues to suffer damages including, but not necessarily limited to, significant lost compensation with respect to the equity which would have vested as of January 1, 2016.

## FOURTH CLAIM FOR RELIEF

### (Whistleblower Retaliation in Violation of The False Claims Act, 31 U.S.C. § 3730(h))

### (Against All Defendants Except Jack Shields)

177.    Mr. Guilfoile realleges and incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

178.    From October to December 2015, Mr. Guilfoile complained to Mr. Shields about what he reasonably believed to be violations of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(g), a *per se* violation of the False Claims Act.

179.    On December 29, 2015, Mr. Guilfoile's employment was involuntarily terminated.

180.    The December 29, 2015 termination occurred approximately two months after Mr. Guilfoile first disclosed to Mr. Shields what he reasonably believed to be Mr. Shields' violations of the Anti-Kickback Statue.

181.    Defendants' termination of Mr. Guilfoile's employment was in retaliation for and causally connected to Mr. Guilfoile's protected whistleblowing.

182.    There was no legitimate non-retaliatory basis for terminating Mr. Guilfoile's employment and Defendants' newly invented claim as to "cause" is mere pretext.

183.    Defendants further retaliated against Mr. Guilfoile by threatening to sue him, fabricating an after-the-fact contention as to "cause," and attempting to repurchase his equity for the amount of $15.

184.    As a direct and proximate result, Mr. Guilfoile suffered and continues to suffer damages including, but not necessarily limited to, loss of employment, past and future lost wages and benefits, and past and future lost equity, bonuses, and distributions.

## FIFTH CLAIM FOR RELIEF
### (Wrongful Termination in Violation of Public Policy)
### (AGAINST ALL DEFENDANTS EXCEPT JACK SHIELDS)

185.    Mr. Guilfoile realleges and incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

186.    From October to December 2015, Mr. Guilfoile complained to Mr. Shields about what he reasonably believed to be violations of law and well-recognized public policy concerns regarding, among other things, violations of the Anti-Kickback Statue, fraud on the shareholders, and contract fraud relating to public health and safety.

187.    On December 29, 2015, Mr. Guilfoile's employment was involuntarily terminated.

188.    Defendants' termination of Mr. Guilfoile's employment was in retaliation for and causally connected to Mr. Guilfoile's protected whistleblowing.

189.    There was no legitimate non-retaliatory basis for terminating Mr. Guilfoile's employment and Defendants' newly invented claim as to "cause" is mere pretext.

190.    Defendants further retaliated against Mr. Guilfoile by threatening to sue him, fabricating an after-the-fact contention as to "cause," and attempting to repurchase his equity for the amount of $15.

191.    As a direct and proximate result, Mr. Guilfoile suffered and continues to suffer damages including, but not necessarily limited to, loss of employment, past and future lost wages and benefits, and past and future lost equity, bonuses, and distributions.

## SIXTH CLAIM FOR RELIEF
### (Breach of Fiduciary Duty)
### (AGAINST DEFENDANT JACK SHIELDS INDIVIDUALLY)

192.    Mr. Guilfoile realleges and incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

193.    Mr. Shields owed fiduciary duties to his other shareholders, including Mr. Guilfoile.

194.    Mr. Shields breached these duties to Mr. Guilfoile by, among other ways, engaging in potentially illegal conduct, fraudulently diverting corporate resources, and terminating Mr. Guilfoile's employment without warning, without reasonable explanation, without a legitimate business purpose, and without seeking less harmful alternatives before resorting to termination.

195.    As a direct and proximate result, Mr. Guilfoile suffered and continues to suffer damages including, but not necessarily limited to, loss of employment, past and future lost wages and benefits, and past and future lost equity, bonuses, and distributions.

### SEVENTH CLAIM FOR RELIEF

#### (Intentional Interference with Advantageous Contractual/Business/Employment Relationships)

#### (AGAINST DEFENDANT JACK SHIELDS INDIVIDUALLY)

196.    Mr. Guilfoile realleges and incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

197.    Mr. Guilfoile had advantageous contractual/business/employment relationships with the Company.

198.    Mr. Shields was aware of Mr. Guilfoile's existing advantageous contractual/business/employment relationships, set forth above.

199.    Mr. Shields, with improper motive and/or through the use of improper means, intentionally and maliciously interfered with Mr. Guilfoile's advantageous contractual/business/employment relationships when he terminated Mr. Guilfoile's employment on December 29, 2015.

200.    As a direct and proximate result, Mr. Guilfoile suffered and continues to suffer damages including, but not necessarily limited to, loss of employment, past and future lost wages and benefits, and past and future lost equity, bonuses, and distributions.

## EIGHTH CLAIM FOR RELIEF

### (Failure to Pay Wages in Violation of Massachusetts Wage Act, M.G.L. Ch. 149 § 148)

### (AGAINST ALL DEFENDANTS)

201.    Mr. Guilfoile realleges and incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

202.    From December 23 to December 29, 2015, Mr. Guilfoile worked for the Company as President.

203.    On December 29, 2015, Mr. Guilfoile's employment was involuntarily terminated.

204.    The date of the termination of Mr. Guilfoile's employment was backdated to December 22, 2015, and the Company failed to pay Mr. Guilfoile wages earned for the December 23 to December 29, 2015 time period.

205.    During the relevant time period, Mr. Shields has been the CEO and/or an officer or agent having responsibility for management of the Company.

206.    As a direct and proximate result, Mr. Guilfoile suffered and continues to suffer damages including, but not necessarily limited to, lost wages.

207.    Mr. Guilfoile filed a Non-Payment of Wage and Workplace Complaint with the Massachusetts Office of the Attorney General and on March 30, 2016 received a Private Right of Action Notice.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment:

A.    Declaring that the acts, practices, and omissions complained of herein violate the FCA and Massachusetts law;

33

B.      Directing the Defendants to properly compensate Mr. Guilfoile for his vested equity or, in the alternative, declaring that Mr. Guilfoile retains all of his vested equity in the Company;

C.      Directing the Defendants to pay Mr. Guilfoile severance, distributions on his vested and unvested equity, and pre-judgment interest with respect to the same;

D.      Directing the Defendants to reinstate Mr. Guilfoile or pay him front pay;

E.      Directing the Defendants to pay Mr. Guilfoile double back pay and benefits, pre-judgment interest with respect to the same, lost future earnings, compensation for emotional distress, and any other compensatory damages;

F.      Directing the Defendants to pay Mr. Guilfoile incidental and consequential damages;

G.      Directing the Defendants to pay Mr. Guilfoile his unpaid wages, treble damages, and pre-judgment interest with respect to the same;

H.      Awarding Mr. Guilfoile reasonable attorneys' fees, costs, and expenses;

I.      Granting Mr. Guilfoile any and all appropriate equitable relief; and

J.      Awarding such other relief as the Court deems just, necessary, and proper.

## **JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Mr. Guilfoile demands a trial by jury on all questions of fact raised by the Complaint.

Dated: April 1, 2016

Respectfully submitted,

**OUTTEN & GOLDEN LLP**
Tammy T. Marzigliano (*pro hac vice*
motion forthcoming)
Nicholas H. Sikon (*pro hac vice*
motion forthcoming)
Amy Biegelsen (*pro hac vice* motion
forthcoming)
3 Park Avenue, 29th Floor
New York, New York 10016
Telephone: (212) 245-1000
Facsimile: (646) 509-2060


*/s/ Patrick J. Hannon*
**HARTLEY MICHON ROBB LLP**
Barbara A. Robb (BBO #639976)
Patrick J. Hannon (BBO# 664958)
155 Seaport Boulevard, 11th Floor
Boston, MA 02210
Telephone: (617) 723-8000
Facsimile: (617) 447-2800

*Attorneys for Plaintiff*