UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THOMAS GUILFOILE, ) ) Plaintiff, ) ) v. ) ) SHIELDS PHARMACY, LLC, et al., ) ) Defendants. ) | Civil Action No.: 16-cv-10652 |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                                                                              **March 10, 2017**

**I.   Introduction**

Plaintiff Thomas Guilfoile ("Guilfoile") has filed this lawsuit against Defendants Shields Pharmacy, LLC, UMass Memorial Shields Pharmacy, LLC, Shields Pharmacy Equity, LLC, Shields Specialty Pharmacy Holdings, LLC, collectively d/b/a Shields Pharmacy Services, a/k/a Shields Health Solutions and John M. Shields, Sr., a/k/a Jack Shields ("Shields"), in his individual capacity (collectively, "Defendants").  D. 29.  Guilfoile alleges that Defendants retaliated against him in violation of the federal False Claims Act, 31 U.S.C. § 3730(h) and also asserts various state law claims against Defendants.  D. 29 ¶¶ 99-163.  Defendants have moved to dismiss all such claims.  D. 32; D. 34.  For the reasons stated below, the Court ALLOWS Defendants' motions to dismiss as to the federal False Claims Act claim (Count IV), D. 32; D. 34, and DISMISSES without prejudice Guilfoile's state law claims because this Court declines to exercise supplemental jurisdiction over them.

## II. Standard of Review

The Court will grant a motion to dismiss pursuant to Rule 12(b)(6) if the complaint fails to plead sufficient facts that "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). The Court "must assume the truth of all well-plead[ed] facts and give the plaintiff the benefit of all reasonable inferences therefrom." Ruiz v. Bally Total Fitness Corp., 496 F.3d 1, 5 (1st Cir. 2007) (citing Rogan v. Menino, 175 F.3d 75, 77 (1st Cir. 1999)). The Court accepts all non-conclusory factual allegations listed in the complaint as true, Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011), but does not have to consider "bald assertions" or "unsupportable conclusions." Doyle v. Hasbro, Inc., 103 F.3d 186, 190 (1st Cir. 1996) (internal quotation mark and citation omitted).

## III. Factual Background

The following facts are alleged in Guilfoile's amended complaint, D. 29, and taken as true for purposes of considering Defendants' motions to dismiss.

Guilfoile alleges that, after having provided free business advice to Shields for years, he officially began to work for Shields full-time in August 2013. Id. ¶ 1. Guilfoile asserts that in this capacity he worked for a single integrated entity that was comprised of several businesses including Shields Pharmacy LLC, UMass Memorial Shields Pharmacy, LLC, Shields Pharmacy Equity, LLC and Shields Specialty Pharmacy Holdings, LLC (collectively, "Integrated Entity"). Id. ¶ 2. Starting in August 2013, Guilfoile was the full-time president of the Integrated Entity, which included serving as the president of all of the joint ventures within the Integrated Entity. Id. ¶¶ 34-37. Under the terms of his August 2013 employment contract, Guilfoile would receive an annual salary of $275,000, an annual bonus, an equity stake in any joint venture launched and incentive bonuses. Id. ¶¶ 38-39. As the Integrated Entity grew, the joint ventures contributed to Guilfoile's salary alongside UMass Memorial Shields Pharmacy, LLC ("UMSP"). Id. ¶ 46.

In October 2014, on behalf of the Integrated Entity, Shields modified the employment contract with Guilfoile such that the equity promised to Guilfoile was clarified. Id. ¶¶ 47-48. Both parties accepted the new contract and abided by it until Guilfoile's termination from the Integrated Entity. Id. ¶¶ 48-49. The terms of Guilfoile's employment were modified a second time when the Integrated Entity planned to reorganize its business structure: subject to this reorganization, Guilfoile agreed to forego some of his equity rights to attract executive talent to the Integrated Entity and agreed that his own equity would vest over the course of three years' time in lieu of the quarterly vesting for which he had previously contracted. Id. ¶¶ 50-54. For all relevant times until his termination, Guilfoile was an employee of the Integrated Entity and Shields served as his immediate supervisor. Id. ¶ 44.

The Integrated Entity partnered with hospitals to provide specialty pharmacy and related services to chronically ill patients by operating a pharmacy directly within the hospital facility and filling specialty prescriptions through an off-site location. Id. ¶ 23. It also ran home infusion and high-risk care management programs. Id. In the course of its business, the Integrated Entity processes prescriptions, bills patients' insurance, provides patients with financial advice and conducts follow-ups. Id. Guilfoile alleges that in the fall of 2015 he became concerned about three areas of the Integrated Entity's business practices. First, Guilfoile learned of a contract between the Integrated Entity and Michael Green ("Green") in which the Integrated Entity paid Green's consulting firm $35,000 per quarter for each hospital contract that Green successfully referred to the Integrated Entity. Id. ¶¶ 63-65. Guilfoile believed that this contract violated the federal anti-kickback statute. Id. ¶¶ 63-70. Guilfoile alerted Shields of his concerns, causing Shields to convince Green to waive the payment yet to be made for one of the two hospital referrals

Green had made. Id. ¶ 72-74. Believing this was insufficient, Guilfoile urged Shields to notify the board of the Integrated Entity of the matter, but Shields refused. Id. ¶ 75.

Second, Guilfoile further alleges that he learned that Shields instructed Robbie Greenglass ("Greenglass"), the Integrated Entity's Director of Business Development, to spend part of his working hours helping Shields secure private equity investments for another business that Shields was preparing to launch independently and separately from the Integrated Entity. Id. ¶ 76. Guilfoile believed that this diverted business resources for Shields's personal gain and constituted a breach of fiduciary duty. Id. ¶¶ 76-77. Guilfoile approached Shields to rectify the situation by classifying Greenglass as a part-time employee, but Shields refused to do so. Id. ¶ 78.

Third, Guilfoile also asserts that he discovered that the Integrated Entity misrepresented in its contracts for partnerships with hospitals that it had a 24/7 call center when no such call center existed. Id. ¶¶ 79-80. Guilfoile urged Shields to remove the misrepresentation from the contracts or build a 24/7 call center to meet the contract obligations, but Shields refused. Id. ¶¶ 81-84.

In December 2015, Shields told Guilfoile that he was concerned that Guilfoile was "going over his head" and suggested that the two consider "parting ways." Id. ¶¶ 86-89. On December 28, 2015, one week after this discussion, Shields terminated Guilfoile's employment with no further explanation. Id. ¶ 91. The next day Shields emailed Guilfoile to confirm his termination. Id. ¶ 92. That same day, Guilfoile received a written termination notice which stated that his termination was retroactive to December 22, 2015. Id. ¶ 93. After being terminated, Guilfoile submitted to the board a letter explaining his concerns regarding the potential misconduct which he had previously reported to Shields. Id. ¶ 94. He further alleges that following these disclosures to the board, Shields threatened to sue him for defamation and tortious interference. Id. ¶ 95.

Finally, on February 26, 2016, Guilfoile received a letter which stated for the first time that he had been terminated for cause. Id. ¶ 97.

## IV.     Procedural History

Guilfoile instituted this action on April 1, 2016. D. 1. He filed an amended complaint on June 10, 2016. D. 29. Defendants subsequently moved to dismiss all claims in the amended complaint. D. 32; D. 34. The Court heard the parties on the pending motion and took the matter under advisement. D. 47.

## V.     Discussion

### A.     Guilfoile's False Claims Act Claim

Defendants first move to dismiss Guilfoile's False Claims Act ("FCA") retaliation claim.[1] D. 35 at 8-16.

The FCA prohibits the reimbursement of false claims. That is, "a defendant violates the FCA only when he or she has presented to the government a false or fraudulent claim, defined as 'any request or demand . . . for money or property' where the government provides or will

---

[1] Guilfoile has moved for leave to respond to supplemental authority and factual allegations raised by Defendants at the motion hearing on September 21, 2016. D. 50. First, Guilfoile requests leave to file supplemental briefing regarding Carlson v. DynCorp Int'l LLC, No. 14-cv-1281, 2016 WL 4434415 (4th Cir. Aug. 22, 2016), an opinion which was published after the close of briefing and raised by Defendants at the motion hearing. D. 50 at 2. Defendants raise no objection, D. 51 at 2, and thus the Court has considered Guilfoile's briefing as to Carlson, D. 50-1 at 1-6; D. 54 at 2. Guilfoile additionally requests leave to file briefing to respond to facts asserted by the Defendants at the motion hearing that were not contained in the complaint. D. 50 at 2. The Court must "take the facts as alleged in the complaint" when considering a motion to dismiss. Deren v. Dig. Equip. Corp., 61 F.3d 1, 1 (1st Cir. 1995). To the extent that Defendants raised factual assertions not otherwise alleged in the operative complaint, the Court did not consider those assertions when deciding the pending motions to dismiss. Furthermore, and by the same token, the Court did not consider Guilfoile's additional factual assertions raised in his supplemental briefing, D. 50-1 at 6-10, that were not contained in the amended complaint. See Portfolioscope, Inc. v. I-Flex Sols. Ltd., 473 F. Supp. 2d 252, 256 (D. Mass. 2007). For these reasons, the Court grants in part and denies in part Guilfoile's motion, D. 50.

reimburse any part of the money or property requested." U.S. ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 225 (1st Cir. 2004) (citing 31 U.S.C. § 3729(c)). In turn, 31 U.S.C. § 3730(h)(1) of the FCA provides protection against retaliation for employees who investigate potential false claims. That statute provides:

> [a]ny employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged . . . because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop [one] or more violations of this subchapter.

Id. To prevail on an FCA retaliation claim, "a plaintiff must show that 1) the employee's conduct was protected under the FCA; 2) the employer knew that the employee was engaged in such conduct; and 3) the employer discharged or discriminated against the employee because of his or her protected conduct." Karvelas, 360 F.3d at 235 (citing McKenzie v. BellSouth Telecomm., Inc., 219 F.3d 508, 514 (6th Cir. 2000)). However, "[a] plaintiff . . . need not have known that his actions could lead to a *qui tam* suit under the FCA, or even that a False Claims Act existed, in order to demonstrate that he engaged in protected conduct." U.S. ex rel. Gobble v. Forest Labs., Inc., 729 F. Supp. 2d 446, 449 (D. Mass. 2010). "Moreover, the heightened pleading requirements of Rule 9(b) [which must be employed in FCA claims] do not apply to a retaliation claim based on an FCA violation." United States v. Compass Med., P.C., No. 09-cv-12124-RGS, 2011 WL 5508916, at *5 (D. Mass. Nov. 10, 2011) (citing Karvelas, 360 F.3d at 238 n.23).

        *1.*     *The 24/7 Call Center Theory*

Defendants move to dismiss Guilfoile's FCA retaliation claim with respect to the allegations that Guilfoile was fired because he discovered that the Integrated Entity falsely maintained that it had a 24-hour call center as part of an attempt to create new partnerships with hospitals and insisted that this representation be corrected. D. 29 ¶¶ 79-85, 132. Defendants

contend that these allegations do not sufficiently support a retaliation claim under the False Claims Act because they fail to show that Guilfoile engaged in any protected conduct, given that the federal government does not own the hospitals in question and Guilfoile does not allege a connection between the allegedly fraudulent contract term and any false claim submissions. D. 33 at 14-16; D. 35 at 15.

To satisfy the first element of an FCA retaliation claim, a plaintiff must show that he or she was engaged in activity protected under the FCA. "Protected conduct" is broadly interpreted in the First Circuit and includes "activities that reasonably could lead to an FCA suit[,] in other words, investigations, inquiries, testimonies or other activities that concern the employer's knowing submission of false or fraudulent claims for payment to the government." Gobble, 729 F. Supp. 2d at 449. While plaintiffs need not show that they knew their actions could lead to a *qui tam* suit under the FCA, Gobble, 729 F. Supp. 2d at 449, they must demonstrate that they were "actually engaged in investigating matters that at least reasonably could lead to an FCA action." United States ex rel. Provuncher v. Angioscore, Inc., No. 09-cv-12176-RGS, 2012 WL 1514844, at *5 (D. Mass. May 1, 2012) (citing United States ex. rel. Hopper v. Anton, 91 F.3d 1261, 1269 (9th Cir. 1996)); United States ex rel. Bartz v. Ortho-McNeil Pharm., Inc., 856 F. Supp. 2d 253, 271 (D. Mass. 2012).

First, it is irrelevant to Guilfoile's claim whether the hospitals were owned by the federal government. As explained in United States ex rel. Garbe v. Kmart Corp., 824 F.3d 632, 638 (7th Cir. 2016), "FCA liability [can] attach to any false claim made to an entity implementing a program with government funds, regardless of whether that entity was public or private." Defendants further argue that even if FCA liability could attach to a false claim made to an entity implementing a program with government funds, Guilfoile has failed to allege that any of the hospitals that

received this allegedly misrepresentation were in fact implementing a program with government funds. D. 45 at 8. Because, however, "[a]ll reasonable inferences in a complaint are to be construed in favor of the plaintiff," Manfield v. Alutiiq Int'l Sols., Inc., 851 F. Supp. 2d 196, 204 (D. Me. 2012) (citing Gargano v. Liberty Int'l Underwriters, Inc., 572 F.3d 45, 48 (1st Cir. 2009)), these allegations allow the Court to infer reasonably that the hospitals were also billing these government programs on behalf of those same patients.

Defendants' next argument—that Guilfoile has not alleged any facts to show a connection between the false contract term and the submission of any false claims—stands on different ground. The complaint includes no factual allegations from which one could infer that, as a result of the fraudulently represented 24/7 call center, Guilfoile believed Defendants presented or could present false claims for reimbursement to the government or the hospitals in question or that Defendants induced third parties to present false claims. D. 29 ¶¶ 79-85. As such, this case is distinguishable from other cases where the court allowed a retaliatory False Claims Act claim to go forward. For instance, the court in United States v. Compass Med., P.C., No. 09-cv-12124-RGS, 2011 WL 5508916, at *6 (D. Mass. Nov. 10, 2011) concluded that the plaintiff engaged in protected conduct because her investigation centered on fraudulent billing sheets that were used to prepare claims to the federal and state government. Similarly in United States ex rel. Wilson v. Bristol-Myers Squibb, Inc., No. 06-cv-12195-MLW, 2013 WL 1331007, at *4 (D. Mass. Mar. 30, 2013), the court determined that the complaints raised could have led to an FCA action because proof of the alleged off-label marketing would cause false claims to be submitted to the government. See Karvelas, 360 F.3d at 237-38 (concluding that only the plaintiff's allegations of investigating improper conduct that was related to false or fraudulent claims constituted protected activity).

Indeed, the falsehood of a contract term in contracts between Defendant and hospitals, without any alleged connection to false claims, cannot support Guilfoile's assertion that he engaged in protected activity that could reasonably lead to an FCA action. Other district courts in this Circuit have concluded the same. For example, in United States ex rel. Goulden v. BAE Sys. Info. & Elec. Sys. Integration, Inc., No. 11-cv-12017-NMG, 2014 WL 3897645, at *9 (D. Mass. Aug. 7, 2014), the court concluded that the plaintiff failed to allege sufficient facts to support the conclusion that he was engaged in protected activity under the FCA retaliation statute because he only pled that he was concerned that the defendant was violating government regulations and not that his employer was submitting false claims pursuant to those contracts.

Guilfoile, in response, relies upon Garbe to argue that the Integrated Entity lied about a material aspect of its services—the 24/7 call center—and that this constituted a false claim. D. 39 at 10-11. The Garbe court, however, explained that a "claim" is "'any request or demand … for money or property, that … is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest' and to which the government either 'provides or has provided any portion of the money or property' or 'will reimburse such contractor, grantee, or other recipient for any portion of the money or property.'" Garbe, 824 F.3d at 638 (quoting 31 U.S.C. § 3729(b)(2) (2009)).

Here, Guilfoile has brought forth no allegations that the government did provide or intended to provide funds directly or through the hospital intermediary to Defendants for the 24/7 call center services. Moreover, Guilfoile's claim related to the call center and not actual submissions for reimbursement and as such is dissimilar to Garbe, in which the defendant corporation used higher prices when submitting requests for reimbursement to insurance

companies handling Medicare claims and subsequently received reimbursements at higher levels. Garbe, 824 F.3d at 636-37.

Carlson v. DynCorp Int'l LLC, No. 14-cv-1281, 2016 WL 4434415 (4th Cir. Aug. 22, 2016), does not change this outcome. In supplemental briefing, Guilfoile argues that the Court should apply the Fourth Circuit standard when evaluating whether Guilfoile engaged in protected conduct because the Fourth Circuit's test better aligns with the FCA amendments. D. 50-1 at 1-2; D. 54 at 2. The Fourth Circuit examines first whether an employee's efforts are related to activities for which there is a distinct possibility of an FCA lawsuit and then whether the employee's "efforts are motivated by an objectively reasonable belief that the employee's employer is violating, or soon will violate, the FCA." Carlson, 2016 WL 4434415, at *3-4. This Court, however, is bound by First Circuit precedent. See Karvelas, 360 F.3d at 235.

Even if the Court did endorse the Fourth Circuit approach and apply the second prong of the Fourth Circuit test—as urged by Guilfoile, D. 50-1 at 2—the Court would reach the same conclusion. That is, if the Court assessed whether Guilfoile alleged facts "sufficient to show that he believed [Defendants were] violating the FCA, that his belief was reasonable, that he took action based on that belief, and that his actions were designed to 'stop [one] or more violations of' the FCA," Carlson, 2016 WL 4434415, at *5, Guilfoile still has not alleged facts sufficient to allege a FCA retaliation claim. As in Carlson, id. at *5-6, Guilfoile's complaint does not contain sufficient factual assertions to support the conclusion that Defendants made or were about to make a false claim on the government and, thus, his alleged belief that Defendants were violating the FCA was not reasonable.

Because Guilfoile has not pled adequately that he fulfilled the first prong of the FCA retaliation test, his claim as to the 24/7 call center is dismissed.

### 2. *The Anti-Kickback Statute Theory*

Defendants also move to dismiss Guilfoile's FCA retaliation claim with respect to the allegedly improper relationship between Defendants and Green. D. 33 at 12-14; D. 35 at 12-14.

UMSP and SSPH first contend that there are no allegations to suggest they were involved in any supposed anti-kickback statute violations resulting from a contractual relationship with Green because neither was party to the contract with Green and neither was involved in business with the two hospitals in New Jersey. D. 33 at 12, D. 33-3. This contention, however, conflicts with the allegations in the complaint, which the Court must presume to be true for purposes of this motion to dismiss. Ruiz, 496 F.3d at 5 (citing Rogan, 175 F.3d at 77). Namely, the complaint alleges that the component businesses, including UMSP and SSPH, were part of an Integrated Entity and that the Integrated Entity entered into a contract with Green for his services. D. 29 ¶¶ 3, 63, 65-66. Although UMSP and SSPH provide a retainer agreement between Shields Pharmacy and Ayrault Consulting Group which is signed by Shields and Green as evidence that UMSP and SSPH were not involved in the contractual relationship with Green, D. 33-3, this document does not foreclose the possibility that UMSP and SSPH were part of this contract by virtue of membership in the alleged Integrated Entity. That is, the Court cannot conclude based upon the allegations lodged in the complaint that the exact business structure of each Defendant entity and the overarching nature of the business relationship of all of these entities together preclude UMSP and SSPH from having some role in the business relationship with Green. Thus, the Court will not dismiss on this ground.

Defendants next argue that Guilfoile has not alleged any "protected activity" that is cognizable in a FCA retaliation claim. D. 33 at 13-16; D. 35 at 12-13. As explained above, a plaintiff must allege facts to show he was engaged in "investigations, inquiries, testimonies or

11

other activities that concern the employer's knowing submission of false or fraudulent claims for payment" to demonstrate "protected activity." Gobble, 729 F. Supp. at 449. Defendants first argue that Guilfoile has not adequately alleged the underlying anti-kickback statute violation that could reasonably have led to an FCA claim because there is no allegation that Green could or did refer federal patients to Defendants. D. 33 at 13-14. The Anti-Kickback Statute imposes liability on:

> whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind . . . in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or . . . in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program.

42 U.S.C. § 1320a–7b(b)(1)(A)-(B). In essence, a kickback violation entails providing remuneration to a person who is in a position to refer federal health care program patients which induces that person to refer such patients. Jones-McNamara v. Holzer Health Sys., 630 F. App'x 394, 401 (6th Cir. 2015). Referral under the statute includes a doctor's recommendation or authorization of care by a particular provider, United States v. Patel, 778 F.3d 607, 612–13 (7th Cir. 2015), or other providers or individuals directly referring or recommending patients to specific services, United States v. Polin, 194 F.3d 863, 867 (7th Cir. 1999). Here, Guilfoile has not alleged facts that Green could or did play a role in referring or recommending federal program patients to Defendants through his financial consultant work with Defendants. D. 29 ¶¶ 63-70. Instead, Guilfoile only alleges that Green was a consultant who advised these hospitals as to their finances and provides no assertions within the amended complaint to demonstrate that Green may have had a role in patient referrals. Id.

Guilfoile contends that he has alleged illegal referrals by alleging that Green contracted with Defendants to ensure Defendants would win contract deals to provide specialty pharmacy services for two New Jersey hospitals. D. 29 ¶¶ 65-67. Guilfoile argues that Green was paid to provide Defendants with "access to a pool of federally insured patients." D. 39 at 9-10. The two cases Guilfoile principally relies upon do not stand for the proposition that general access to patients amounts to a referral or recommendation. In United States ex rel. Lisitza v. Johnson & Johnson, 765 F. Supp. 2d 112 (D. Mass. 2011), for one example, the defendant provided remuneration to consultant pharmacists to induce those pharmacists to directly prescribe or recommend its drugs to patients and their treating physicians; he did not pay for amorphous access to patients. Id. at 114-117, 119. Similarly, in United States ex rel. Gale v. Omnicare, Inc., No. 10-cv-127, 2012 WL 4473265, at *1 (N.D. Ohio Sept. 26, 2012), the defendant offered pricing discounts to nursing homes for drugs covered under Medicare to induce those homes to refer other patients to the defendant for which the defendant could bill public insurance programs. Id. at *6. Thus, Guilfoile has not set forth sufficient factual allegations to support a plausible anti-kickback statute violation and, as a result, fails to demonstrate that he was investigating wrongdoing that reasonably could lead to an FCA action.

Even if Guilfoile had demonstrated a plausible anti-kickback statute violation, Defendants next contend that Guilfoile has failed to show that such a violation could reasonably lead to liability under the FCA. D. 33 at 14; D. 35 at 12. The Court agrees. An illegal payment that violates the anti-kickback statute constitutes a false claim violation only when it results in a false claim being submitted to the government. See Wilson, 2013 WL 1331007, at *4-5; United States ex rel. Ruscher v. Omnicare, Inc., No. 08-cv-3396, 2015 WL 5178074, at *24 (S.D. Tex. Sept. 3, 2015). Guilfoile asserts that Congress amended the anti-kickback statute such that a violation of the

statute de facto constitutes a false or fraudulent claim under the FCA. D. 39 at 9. The language of the statute, however, states that "a claim that includes items or services resulting from a violation of [the anti-kickback statute] constitutes a false or fraudulent claim [under the FCA]." 42 U.S.C. § 1320a-7b(g). Thus an individual still needs a claim to transform an anti-kickback statute violation into an FCA violation. See, e.g., United States ex rel. Kroening v. Forest Pharm., Inc., 155 F. Supp. 3d 882, 890-91 (E.D. Wis. 2016) (citing U.S. ex rel. Rost v. Pfizer, Inc., 736 F. Supp. 2d 367, 376 (D. Mass. 2010)); see also United States ex rel. Ge v. Takeda Pharm. Co., 737 F.3d 116, 124 (1st Cir. 2013) (explaining that because "FCA liability attaches only to false claims, . . . merely alleging facts related to a defendant's alleged misconduct is not enough" (emphasis in original) (citations omitted)). Thus the central question becomes whether Guilfoile alleged facts to show that false claims may have been submitted as a result of the alleged kickbacks to Green.

As Defendants contend, D. 33 at 14; D. 35 at 12-13, Guilfoile alleges no such facts and thus Guilfoile's retaliatory claim cannot survive. As to the alleged kickback scheme, Guilfoile has only pled that Green was paid for successfully assisting the Integrated Entity in winning hospital contracts, that Green advised the Integrated Entity to bid below a certain threshold to ensure that it would win hospital contracts and that such steering of these contracts to the Integrated Entity may have violated the anti-kickback statute. D. 29 ¶¶ 63, 65-69. Guilfoile, however, alleges no facts to show how the alleged anti-kickback statute violation could have led to the submission of false claims either by the pharmacy or the hospitals in question and thus does not show how he was engaged in investigating conduct that could reasonably lead to an FCA claim.

This case stands on different ground from Gobble, 729 F. Supp. 2d 446. There, the plaintiff allegedly investigated illegal "speaker fee" kickbacks paid to doctors to induce them to overprescribe two types of prescription drugs, causing these doctors to submit false or fraudulent

14

claims based upon these prescriptions to government health insurance programs. Id. at 447, 450. As a result, the court concluded that his activities reasonably could have led to a viable FCA action. Id. at 450. Dissimilarly, here, Guilfoile provides no allegations to explain how the business deal between Defendants and Green could have reasonably led to the potential submission of false or fraudulent claims. Indeed, as Gobble highlights, "[t]he fact that an employee might believe that he was fired for being a good corporate citizen and rooting out illegal conduct does not necessarily imply that he was fired for conduct taken in furtherance of efforts to avoid FCA violations." Id. at 450; see Karvelas, 360 F.3d at 237 (1st Cir. 2004) (concluding that dismissal was warranted because the regulatory problems that the plaintiff investigated did not encompass activity that could reasonably lead to an FCA action).

Carlson also does not aid Guilfoile. In that case, the plaintiff alleged that he was retaliated against after investigating a potential FCA violation by his employer, namely "under billing the government on existing contracts" and submitting a bid for another government contract that was too low given the likely costs. Carlson, 2016 WL 4434415 at *1, 5. The Fourth Circuit affirmed dismissal, explaining that the plaintiff's complaint "articulates no mechanism by which failing to charge certain . . . expenses could later result in the government being fraudulently over billed" and that the court was not aware of any FCA provision or case that would make under billing a violation. Id. at *5. The same is true here: Guilfoile has not alleged how the Defendants' submission of low bids to win the hospital contracts could potentially result in fraudulent overbilling to the government. Beyond this, the complaint does not articulate how the relationship between Defendants and Green is ultimately related to any potential false claims being submitted to the government at some point in the future.

For all of these reasons, the Court dismisses Guilfoile's FCA retaliation claims.[2]

### B. Guilfoile's Remaining State Law Claims

Defendants Shields, Shields Pharmacy, LLC and Shields Pharmacy Equity, LLC next contend that this Court should decline to exercise supplemental jurisdiction over the remaining state law claims. D. 35 at 5. These defendants further assert that there is already a state court case pending in Plymouth County that encompasses many of the same factual and legal issues in which Guilfoile's state-based claims could be litigated. D. 35 at 5, 5 n.4.

"Federal courts are courts of limited subject matter jurisdiction." Feijoo v. Mass. Dep't of Corr., No. 10-cv-11951-DJC, 2012 WL 892888, at *6 (D. Mass. Mar. 14, 2012). When a federal court has federal question subject matter jurisdiction, that court also has supplemental jurisdiction over state law claims that arise from a common nucleus of operative facts. 28 U.S.C. § 1367(a); GE Buildtech Corp. v. KGCI, Inc., No. 13-cv-10761-IT, 2015 WL 751110, at *3 (D. Mass. Feb. 23, 2015) (quoting Ortiz–Bonilla v. Federación de Ajedrez de P.R., 734 F.3d 28, 35 (1st Cir. 2013)). 28 U.S.C. § 1367(c)(3), however, provides that a federal court may refuse to exercise supplemental jurisdiction when it has dismissed all claims over which it has original jurisdiction. The Court has broad discretion over whether to exercise supplemental jurisdiction and "[i]t has consistently been recognized that [supplemental] jurisdiction is a doctrine of discretion, not of plaintiff's right." Jutkiewicz v. Roldan, No. 13-cv-10998-FDS, 2015 WL 4572250, at *1 (D. Mass. July 28, 2015) (quoting United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966) (second alteration in original).

---

[2] Given that Guilfoile has not satisfied the first prong of this claim, the Court need not reach Defendants' further argument that Guilfoile failed to allege that Defendants knew that he was engaged in protected conduct. D. 35 at 3, 14.

Here, the Court initially had original jurisdiction over the federal claim in Count IV. D. 29 ¶¶ 7-8. The Court, however, has now dismissed Guilfoile's federal claim. The Court can choose to exercise supplemental jurisdiction over the state law claims, but "[a]s a general principle, the unfavorable disposition of a plaintiff's federal claims at the early stages of a suit, well before the commencement of trial, will trigger the dismissal without prejudice of any supplemental state-law claims." Feijoo, 2012 WL 892888, at *6 (quoting Rodriguez v. Doral Mortg. Corp., 57 F.3d 1168, 1177 (1st Cir. 1995)). Here, the Court finds no reason to otherwise exercise supplemental jurisdiction. This case is at an early stage and it would not present an undue burden on the parties or offend judicial economy for Guilfoile to litigate his claims in the already-pending related state court matter. See Denis v. Cayanus, No. 12-cv-11893-RWZ, 2013 WL 5537308, at *1–2 (D. Mass. Oct. 7, 2013). Moreover, the crux of Guilfoile's argument to contrary is that the matter should remain here because it is, at core, "a central federal dispute," D. 39 at 19. The Court, however, has now dismissed Count IV, the centerpiece of this contention. For these reasons, the Court declines to exercise supplemental jurisdiction over Guilfoile's state claims and dismisses Counts I through III and V through VIII without prejudice.

**VI.    Conclusion**

For the reasons discussed, the Court ALLOWS Defendant's motion to dismiss as to Count IV, D. 32; D. 34, and DISMISSES Guilfoile's state law claims without prejudice.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge