**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____

|  |  |  |
|---|---|---|
| **THOMAS GUILFOILE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 16-cv-10652** |
| | ) | |
| **SHIELDS PHARMACY, LLC, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

_____


**<u>MEMORANDUM AND ORDER</u>**

**CASPER, J.**                                                 **September 29, 2021**

## I.   Introduction

Plaintiff Thomas Guilfoile ("Guilfoile") has filed this lawsuit against Defendants Shields Pharmacy LLC ("Shields Pharmacy"), UMASS Memorial Shields Pharmacy, LLC ("UMSP"), Shields Pharmacy Equity, LLC ("Shields Equity"), Shields Specialty Pharmacy Holdings, LLC (Shields Holdings") (collectively, "Corporate Defendants") and John M. Shields, Sr. (Shields") in his individual capacity asserting claims for breach of contract (Count I),  declaratory judgment (Count II), breach of the implied covenant of good faith and fair dealing (Count III), retaliation in violation of the False Claims Act, 31 U.S.C. § 3730(h) ("FCA") (Count IV), wrongful termination (Count V), breach of fiduciary duty (Count VI), intentional interference with advantageous contractual/business/employment relationship (Count VII) and failure to pay wages in violation of Massachusetts Wage Act, Mass. Gen. L. c. 149 § 148 (Count VIII).  D. 29.  Guilfoile brings Counts

1

I-V against Corporate Defendants, Counts VI-VII against Shields in his individual capacity and Count VIII against all Defendants.  Defendants now move for partial summary judgment, D. 143, and Guilfoile moves for cross partial summary judgment, D. 146.  For the reasons discussed below, the Court ALLOWS Defendants' motion as to the measure of damages for breach of contract (Count I), declaratory judgment (Count II), FCA retaliation (Count IV), wrongful termination (Count V), breach of fiduciary duty (Count VI), intentional interference (Count VII) and the Wage Act Claim (Count VIII), D. 142, and DENIES Guilfoile's motion for summary judgment.  D. 146.

## II.    Standard of Review

The Court grants summary judgment where there is no genuine dispute regarding any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A material fact is one that "carries with it the potential to affect the outcome of the suit under the applicable law."  García-González v. Puig-Morales, 761 F.3d 81, 87 (1st Cir. 2014) (quoting Newman v. Advanced Tech. Innovation Corp., 749 F.3d 33, 36 (1st Cir. 2014)) (internal quotation mark omitted).  The moving party "bears the burden of demonstrating the absence of a genuine issue of material fact."  Rosciti v. Ins. Co. of Pa., 659 F.3d 92, 96 (1st Cir. 2011) (citation omitted).  Once that burden is met, the non-moving party may not rest on the allegations or denials in his pleadings, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986), but, "with respect to each issue on which [he] would bear the burden of proof at trial," must "demonstrate that a trier of fact could reasonably resolve that issue in [his] favor."  Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010) (citations omitted).  The Court views the record in the light most favorable to the non-moving party, "drawing reasonable inferences" in his favor.  Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009) (citation omitted).  "Conclusory allegations, improbable inferences, and unsupported speculation," however, are

"insufficient to establish a genuine dispute of fact."  Travers v. Flight Servs. & Sys., Inc., 737 F.3d

143-1, 146 (1st Cir. 2013) (citation and internal quotation mark omitted).

## III.    Factual Background

### A.    Guilfoile's Employment with Defendants

The following facts are drawn from the parties' statements of material facts as well as

supporting filings and are undisputed unless otherwise noted.  Shields Health Solutions ("SHS")

is an entity under which Defendants operated businesses that provided flexible specialty pharmacy

solutions to hospital partners.[1]  D. 161 ¶ 1.  In August 2013, SHS hired Guilfoile as its president.

D. 161 ¶ 2.  During the time Guilfoile was employed by Corporate Defendants, the collection of

entities was known as SHS, D. 163 ¶ 5, and shared the same management team including Shields

as Chief Executive Officer, Guilfoile as president and John Lucey ("Lucey") as Chief Financial

Officer.  Id. at ¶¶ 6-7.

### B.    Negotiation of Employment Terms

In August 2013, Guilfoile prepared a term sheet regarding the terms of his employment.

D. 145-2; D. 161 ¶ 4.  This term sheet, to be effective as of August 26, 2013, provided that Guilfoile

would serve as President of Shields Pharmacy, would receive an annual salary of $275,000, would

be entitled to certain profit sharing, would receive certain equity in the company and would be

entitled to 12 months' severance (and including already vested ownership) upon termination other

than voluntary termination.  D. 145-2 at 3-4.  In the spring or summer of 2014, Guilfoile realized

he had misunderstood the Corporate Defendants' structure in relation to part of his equity interests

---

[1] Guilfoile alleges that the Corporate Defendants comprise an "integrated entity" and retained him/
participated in the alleged wrongful acts as a single entity.  Defendants deny these allegations, but
for the purposes of the present motion and statement of undisputed material facts only, do not
contest that issue.  D. 161 at 1, n.1.

under the employment agreement.  D. 161 ¶ 5. As a result of this misunderstanding, in October 2014, Guilfoile and Shields discussed Guilfoile's equity and bonus compensation.  Id. ¶ 6.  After meeting on both October 7 and October 13, 2014, Guilfoile sent Shields an email to confirm what he believed their agreement to be regarding his compensation package.  Id. ¶ 8.  Guilfoile acknowledged that he did not own equity in UMSP directly.  Id. ¶ 10.  On October 17, 2014, Guilfoile forwarded an October 14, 2014 email to attorneys at the law firm Mintz Levin, asking them to prepare an agreement consistent with the terms set forth in his email.  Id. ¶ 11.  Pursuant to the original term sheet, the parties agreed that the Corporate Defendants would repurchase Guilfoile's vested equity in the event of a termination.  Id. ¶ 15.  Between December 2014 and September 2015, Guilfoile and Lucey worked with attorneys at Mintz Levin to prepare incentive interest agreements for some of the Corporate Defendants' employees, including Guilfoile.  Id. ¶ 17.  On September 4, 2015, Mintz Levin circulated the most recent drafts of the incentive interest agreements to Guilfoile and Lucey.  Id. ¶ 18.  Mintz Levin prepared incentive interest agreements for Guilfoile and attached them to the September 4, 2015 email; there was an agreement for each of the businesses that existed at the time aside from UMSP:  Shields Pharmacy, LLC, Shields Pharmacy of Greater Springfield, LLC, Shields Pharmacy of Newark, LLC, Shields Pharmacy of Berkshire, LLC, Shields Pharmacy of Hartford, LLC, Shields Pharmacy of Camden, LLC and Shields Specialty Pharmacy Holdings, LLC (collectively, the "incentive agreements").  Id. ¶ 20.

### C.    <u>Guilfoile Expresses Concern regarding Alleged Kickback</u>

Michael Greene ("Greene") owns and operates a healthcare consulting and advisement firm called Ayrault Consulting Group.  D. 161 ¶ 45.  In October 2012, Greene, a contact of Shields, introduced Shields to Dr. John Brennan, the president and chief executive officer of Newark Beth Israel Medical Center ("NBIMC").  Id. ¶ 47.  In January 2013, Ayrault executed a contract with

NBIMC to provide consulting services directly to Dr. Brennan, Id. ¶ 48, and pursuant to the contract, Greene was a consultant and not an employee of the hospital or its parent company, Barnabas. Id. ¶ 49. Around the same time that Ayrault and the hospital executed their consulting contract, Greene advised Dr. Brennan that he intended potentially to provide services to SHS. Id. ¶ 52. In late 2013, a meeting was held between NBIMC and SHS with Dr. Brennan, Dominic Segalla ("Segalla"), NBIMC's vice president of finance, Ralph Iadorola, Greene and Shields. Id. ¶¶ 53-54. Prior to this meeting, Greene disclosed to Segalla that he intended to do business with SHS and that he had recused himself from NBMIC's consideration of or negotiations with SHS. Id. ¶ 55.

NBIMC and SHS executed a contract on March 31, 2014. Id. ¶ 60. Neither SHS nor NBIMC submitted a claim to the federal government for reimbursement of the services provided to NBIMC. Id. ¶ 62. The Corporate Defendants did not own a specialty pharmacy at NBIMC, nor did they operate a specialty pharmacy for NBIMC. Id. at ¶ 63. Instead, NBIMC had pre-existing relationships with contract pharmacies that provided 340B outpatient services to NBMIC patients. Id. ¶ 64.

In September 2014, Corporate Defendants and Ayrault executed a contract recognizing Ayrault as an independent contractor. Id. ¶ 89. The Corporate Defendants also issued payments to Ayrault under that contract for Greene's introductions to NBIMC and the hospital. Id. ¶ 90.

In September 2015, Lucey requested Guilfoile's approval to pay Ayrault consistent with the terms of the contract. In response, on September 23, 2015, Guilfoile requested and received a copy of the Ayrault contract from Lucey. Id. ¶ 92. Guilfoile raised concerns regarding an alleged kickback in an email to Shields on January 3, 2016, after his termination. Id. ¶ 102. Guilfoile testified in his deposition that he had already consulted with attorneys at the time he sent the

January 3, 2016 email.  Id. ¶ 104.  During the time Guilfoile expressed concerns about the Ayrault contract, he also sought confirmation that Michael Nudo of MKN Capital LLC, which executed a contract with the Corporate Defendants around the time of the Ayrault contract,  had disclosed a potential conflict of interest to the hospitals to which he had introduced the Corporate Defendants. Id. ¶ 107.

### D.  Guilfoile's Termination

In December 2015, Shields terminated Guilfoile.  D. 161 ¶¶ 22-23.  Guilfoile alleges that he was terminated by Shields "because he did not want [Guilfoile] to disclose his activities to the board and to UMass," in particular "the contract with Michael Greene, the misrepresentation in the CNE contract [about a 24/7 call center], and the establishment of Waterline Ventures with Robbie Greenglass."  Id. ¶ 27.  A week later, on December 29, 2015, Shields sent Guilfoile an email confirming his termination and explaining that Guilfoile's final check would include "any remaining earned time and unused PTO."  Id. ¶ 31-32.  On the same day, SHS's human resources manager, Anne Maloney, sent Guilfoile a follow-up letter, explaining that his "final base salary payment and accrued but unused vacation ha[d] been processed."  Id. ¶ 33.  Guilfoile received a paycheck dated December 24, 2015, and another dated December 30, 2015, Id. ¶¶ 33, 37, the latter being equivalent to seven days' worth of Guilfoile's base pay.  Id. ¶ 38.  Following Guilfoile's termination, the Corporate Defendants tendered payment for the repurchase of his equity in each of its business that existed at that time.  Id. ¶ 42.[2]

---

[2]Having considered the motions, D. 170, 185, and the opposition to same, D. 186, 189, the Court DENIES Guilfoile's motions to strike the Declarations of Brian S. Smith, Gary Lapidas and Domenic Segalla.  As to Guilfoile's motion for leave to file a reply brief regarding his request for judicial notice, D. 201, the Court considered the motion and the opposition, D. 202, and DENIES the motion.

**IV.     Procedural History**

Guilfoile filed this lawsuit against the Corporate Defendants and Shields on April 1, 2016, D. 1, and amended his complaint on June 10, 2016.  D. 29.  On Defendants' motion to dismiss the amended complaint, D. 32, 34, the Court dismissed Guilfoile's FCA retaliation claim based upon the alleged kickbacks to Greene and contractual misrepresentations regarding the 24/7 call center and declined to exercise supplemental jurisdiction over the related state law claims.  D. 55. Guilfoile appealed to the First Circuit, D. 66, and the First Circuit vacated in part as to the FCA retaliation claim as to the kickbacks as he had plausibly pled the elements of this claim including that "he engaged in protected conduct within the meaning of an FCA retaliation claim."  D. 69 at 29-31; Guilfoile v. Shields, 913 F.3d 178, 193 (1st Cir. 2019).  It, however, affirmed the Court's dismissal of the FCA retaliation claim as to the 24/7 call center, "agree[ing] with the district court that Guilfoile has not sufficiently pleaded a connection between the 24/7 call center contractual terms and the submission of any claim."  Id. at 32.

After remand, Guilfoile filed a second amended complaint, D. 80, which remains the operative complaint.  Shields filed a counterclaim for abuse of process, D. 89 at 25-44.  The Court denied Guilfoile's motion to dismiss the counterclaim.  D. 91, 113. The Corporate Defendants have now moved for partial summary judgment on the measure of damages as to the breach of contract claim (Count I), declaratory judgment (Count II), FCA retaliation (Count IV) and wrongful termination in violation of public policy (Count V).  D. 142.  All Defendants move for partial summary judgment on violation of the Wage Act (Count VIII) and Shields moves for summary judgment on the breach of fiduciary duty (Count VI) and intentional interference (Count VII) claims.  Id.  UMSP seeks summary judgment on breach of contract (Count I), declaratory judgment (Count II), and breach of the implied covenant of good faith and fair dealing (Count III). Id.  Guilfoile also moves for partial summary judgment as to breach of contract (Count I),

declaratory judgment (Count II), FCA retaliation (Count IV) and the Wage Act (Count VIII) claims and the abuse of process counterclaim. D. 146. The Court heard the parties on the pending cross motions and took the matter under advisement. D. 190.[3]

## V.    Discussion

### A.    Breach of Contract Claim (Count I)

#### 1.    Guilfoile's Summary Judgment Motion

Guilfoile moves for summary judgment on the breach of contract claim, contending that he entered an enforceable contract with Corporate Defendants in August 2013 regarding the terms of his employment, and that this contract was only modified as to its incentive equity terms in October 2014. D. 147 at 15. Although it is undisputed that Shields Pharmacy and Guilfoile entered an employment contract in August 2013, it remains disputed which employment contract governs for purposes of the present matter. D. 143 at 9. Guilfoile contends that the August 2013 term sheet governs, and that while the parties "later modified the incentive equity term . . . they left the rest of that contract untouched (including its severance provision)." D. 147 at 15. To state a claim for breach of contract under Massachusetts law, a plaintiff must allege that "a valid, binding contract existed, the defendant breached the terms of the contract and the plaintiff sustained damages as a result of the breach." Young v. Wells Fargo Bank, N.A., 717 F.3d 224, 232 (1st Cir. 2013) (citations omitted). Here, Guilfoile premises his breach of contract claim on the parties' August 2013 agreement, which he claims was memorialized by a term sheet to constitute the 2013 employment agreement and was modified in October 2014 ("October 2014 Contract") based on both written discussions and oral communications. D. 161 at 6. Although Corporate Defendants

---

[3]Having considered Guilfoile's post-hearing motion for leave to file a reply brief, D. 195, and the opposition to same, D. 196, the Court denied the motion.

see the October 2014 Contract as superseding and ultimately governing the terms of Guilfoile's employment, Guilfoile provides as evidence that the agreement was in fact just a modification because as he testified during his deposition, he misunderstood the Corporate Defendants' structure with regards to his equity interests under the 2013 employment agreement, and initially approached Shields to discuss same.  D. 149-7 at 42-45.  As such, there exists a genuine issue of material fact as to whether the October 2014 discussions and subsequent agreement constitute a modification or superseding and thus, governing agreement between the parties.  See Dennis v. Kaskel, 79 Mass. App. Ct. 736 (2011) (holding that a genuine issue of material fact as to whether plaintiff and defendant ever agreed to terms of a memorandum precluded summary judgment). Even assuming arguendo that the term sheet could constitute a contract or memorialization of orally agreed upon terms, it is undisputed that the term sheet was not signed by both parties, undercutting arguments that it constituted a meeting of the minds.  Further, "[u]nder Massachusetts law, when parties have agreed to execute a final written agreement, there is a strong inference that the transaction is still open and that the parties are not bound until such a written agreement is produced."  Aegis v. Finnegan, 2002 WL 225924, at *2 (D. Mass. Feb. 12, 2002) (internal quotation marks and citation omitted).  "If, however, the parties have agreed upon all material terms, it may be inferred that the purpose of a final document which the parties agree to execute is to serve as a polished memorandum of an already binding contract."  Goren v. Royal Invs. Inc., 25 Mass. App. Ct. 137, 140 (1987);  Aegis, 2002 WL 225924, at *2 (noting that "[a]n unwritten binding contract may exist when there is enough evidence of an oral agreement to infer that a contract existed, and that a final written document was largely an outstanding formality").

2.   *Corporate Defendants Move for Partial Summary Judgment as to the Measure of Damages*

As to the same breach of contract claim, the Corporate Defendants seek summary judgment as to the proper measure of damages if Guilfoile prevails on this claim.  D. 143 at 16.  Although the parties disagree about which agreement governed Guilfoile's employment, it is undisputed that the Company agreed to repurchase Guilfoile's vested equity upon his termination.  Even as alleged by Guilfoile, the term sheet upon which he relied for Count I required repurchase of his vested equity upon termination.  D. 145-2 at 3-4; D. 143 at 16.  It is also undisputed that the Corporate Defendants tendered an offer to repurchase equity when he was terminated. D. 161 ¶ 42.

Accordingly, the Court concludes that there is no genuine dispute of material fact as to the Corporate Defendants agreeing to repurchase Guilfoile's vested equity upon termination, D. 161, and this is the proper measure of damages.  "The usual rule for damages in a breach of contract case is that the injured party should be put in the position they would have been in had the contract been performed."  Situation Mgmt. Sys., Inc. v. Malouf, Inc., 430 Mass. 875, 880 (2000).  Here, that would be any difference between the amount tendered for his vested equity by the Corporate Defendants and the amount to which Guilfoile was due under the agreement for that vested equity at the time of his termination.  As such, if Guilfoile prevails on the breach of contract claim at trial, the only issue as to damages for the jury would be to determine is whether the amount tendered was sufficient based on the governing contractual agreement.

Contrary to Guilfoile's contention otherwise, Corporate Defendants are not seeking to recovering under a contract or prompt his specific performance, but are instead seeking to establish that if he prevails on this claim at trial, his damages are limited to those to put him in the position he would have been in had there been no alleged breach by Corporate Defendants.  Ficara v. Belleau, 331 Mass. 80, 82 (1954) (noting that a plaintiff is "entitled to be made whole and no

more"); see Nat'l Fire Protection Ass'n v. Intern. Code Council, Inc., No. 03-cv-10848 DPW, 2006 WL 839501, at *28-29 (D. Mass. Mar. 29, 2006) (granting summary judgment as to the proper measure of damages for a claim); Giese v. Pierce Chem. Co., 43 F. Supp. 2d 98, 108-10 (D. Mass. 1999) (granting summary judgment as to the proper measure of damages for a claim); Rudsten v. Reynolds, No. 80-cv-0764-Z, 1982 WL 1306, at *2-3 (D. Mass. Mar. 17, 1982) (granting summary judgment as to the proper measure of damages for a claim). This is particularly true where the breach of contract is based in substantial part on the failure to pay equity under the parties' agreement. D. 80 at 24. For all of these reasons, the Court ALLOWS summary judgment to Corporate Defendants on Count I, but only as to the measure of damages and, accordingly, the breach of contract claim otherwise proceeds to trial.

### B.      Declaratory Judgment (Count II)

Guilfoile seeks declaratory judgment given the dispute between the parties as to his "continued ownership in the [Corporate Defendants] based on his vested equity interests" because the Defendants' repurchase improperly devalued those interests. D. 80 ¶ 137. Accordingly, he seeks a declaratory judgment that "he owns outright and without restriction the vested equity" under the parties' agreement. Id. ¶ 138. Guilfoile and the Corporate Defendants seeks summary judgment as to this claim, Count II. To the extent that Guilfoile seeks a ruling regarding the measure of damages in this claim, the Court has resolved that matter in regard to summary judgment for the Corporate Defendants as to the measure of damages for Count I, the breach of contract claim. To the extent that he seeks a declaratory judgment that he owns vested equity "outright and without restriction," such declaration would be contradicted by the undisputed record that the Corporate Defendants had a right to repurchase the vested equity at his termination and tendered an offer to do so. Guilfoile, however, retains the argument that this tender offer was an

inappropriately devalued price at trial as to what the damages should be if he prevails on the breach of contract claim.  To the extent that seek any further relief, his declaratory judgment claim "rests on the exact same facts and legal arguments as his request on his breach of contract claim."  D. 186 at 17, D. 147 at 7.  Thus, "rendering a declaration would not be of any practical assistance to clarifying the merits of his underlying claims where resolving the breach of contract claim will settle the principal legal issue," O'Hara v. Standard Fire Ins. Co., No. 16-cv-12378-GAO, 2017 WL 8315886, at *7 (D. Mass. Sept. 8, 2017) (citations omitted); see Gormally Broad. Licenses, LLC v. Charter Commc'n Holding Co., LLC, No. 16-cv-30152-MGM, 2017 WL 3131986, at *6 (D. Mass. Feb. 28, 2017) (dismissing a declaratory judgment claim as duplicative of breach of contract claim), particularly where this breach of contract will proceed to trial.  Accordingly, the Court DENIES summary judgment to Guilfoile, but ALLOWS it as Corporate Defendants as to Count II.

### C.    FCA Retaliation (Count IV)

To prevail on an FCA retaliation claim, the First Circuit requires that a plaintiff first must show only "conduct that could reasonably lead to an FCA action based on the submission of a false claim."  Guilfoile, D. 69 at 20.  Once a plaintiff has shown that he has engaged in protected conduct, he must  also show that his employer knew that he was engaged in protected conduct and that his employer retaliated against him because of that conduct.  Id. at 30; United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 235 (1st Cir. 2004) (citing McKenzie v. BellSouth Telecomm., Inc., 219 F.3d 508, 514 (6th Cir. 2000)).  Guilfoile moves for summary judgment as to the first two elements of this claim.

### 1.    Protected Conduct

Now, after discovery and a full developed record, Corporate Defendants contend that Guilfoile has failed, as a matter of undisputed fact, to establish even the first element of his FCA retaliation claim.  As discussed above, "[a] plaintiff . . . need not have known that his actions could lead to a *qui tam* suit under the FCA, or even that a False Claims Act existed, in order to demonstrate that he engaged in protected conduct." U.S. ex rel. Gobble v. Forest Labs., Inc., 729 F. Supp. 2d 446, 449 (D. Mass. 2010).  He need only show, as noted above, conduct that could reasonably lead to an FCA action based on the submission of a false claim.  Even with this standard, Guilfoile has failed to show this requisite element.

Here, Guilfoile alleges that the Corporate Defendants violated the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(g), as a predicate for a FCA claim, in their payments to Greene.  Specifically, he alleges the Corporate Defendants "willfully paying renumeration to induce a person to refer patients for a furnishing of a service for which the [Corporate Defendants] knew payment would be made under federal health care programs and by knowingly entering into contracts with materially false terms with government-owned hospitals thereby causing to be presented false and fraudulent claims to the federal government."  D. 29 at 22.  The undisputed record does not reflect conduct that could reasonably lead to a FCA action based on the submission of a false claim for at least three reasons.

First, any payments to Greene could not have led to a viable FCA action because he did not have the authority to, and did not, refer any health care program business to the Corporate Defendants.  D. 145 at 22.  That is, any payments to Greene did not constitute an illegal kickback under the AKS which must be remuneration directed at a person or entity in a position to make such referral and reasonably induces them to do so. Jones-McNamara v. Holzer Health Sys., 630

F. Appx. 394, 401 (6th Cir. 2015).  Although Guilfoile alleged that the Corporate Defendants violated the AKS by paying kickbacks in exchange for his referral of two hospitals, University Hospital and NBIMC, on a full record and now undisputedly, Greene had no authority for such referral and a result of disclosure of potential conflicts of interest, he was recused from, and not involved with, the hospitals' consideration of same.  D. 145 at 23-24 (citing record); D. 183 at 8-10 (same).  As a result of same, neither Greene nor anyone at his company, Ayrault, participated in the hospitals' consideration of same.  Id. at 24 (citing record).

Second, Guilfoile has failed to satisfy this first element of his FCA retaliation claim since any Corporate Defendants engaged with the hospitals did not cause a claim to be submitted to the federal government.  For a AKS violation to amount to a violation of the FCA, a claim must be submitted to the federal government.  42 U.S.C. § 1320a-7b(g); see Karvelas, 360 F.3d at 225; United States ex rel. Kelly v. Novartis Pharm. Corp., 827 F.3d 5, 14 (1st Cir. 2016) (noting that "FCA liability does not attach to violations of federal law or regulations, . . . that are independent of any false claim" (internal citation omitted)).  The undisputed record here is that the Corporate Defendants did not own or operate specialty pharmacies at either hospital and the Corporate Defendants did not submit claims to federal insurance programs for services that were provided to the hospitals.  D. 145 at 26 (citing record); D. 183 at 9 (same).   To extent that Guilfoile relies upon Management Service Agreements with NBIMC and University Hospital that specified that the Corporate Defendants would provide Medication Therapy Management ("MTM"), a service billable to Medicare, D. 152 at 14, n. 4, to say that such claims were submitted to the federal government, that also fails on this record.  Such contention is contradicted by Guilfoile's own admission during deposition that Corporate Defendant's services to the two hospitals were not in fact reimbursable, and that there were no claims submitted on behalf of either hospital.  D. 149-7

at 195-97;  see  D. 149-24 at 220, D. 149-17 at 26, D. 168 at 20.  Without a sufficiently claimed

nexus or "reasonable connection between the alleged conduct and the submission of claims within

the purview of the FCA," Guilfoile, 913 F.3d at 195, this Court cannot conclude that the Corporate

Defendant's conduct " could [reasonably] lead to an FCA action."  United States ex. rel. Booker

v. Pfizer, Inc., 847 F.3d 52, 59 n.8 (1st Cir. 2017) (internal citation omitted).

Third, Guilfoile also fails to show the first element of his FCA retaliation because his pre-

December 2015 termination concerns related to conflict of interest and ethics questions, not false

claims as required for conduct that could reasonably lead to a FCA claim.   For all of these reasons,

Guilfoile has not shown that the undisputed record as to the first element of his FCA claim entitles

him to summary judgment,  Elliot-Lewis v. Abbott Labs., Inc., 411 F. Supp. 3d 195, 208 (D. Mass.

2019) (granting summary judgment where "plaintiff has not shown any violations of the FCA"

and alleged protected conduct "have unlikely connection to the submission of fraudulent claims to

the government"), and the Court need not address the other requisite elements of this claim.

Accordingly, the Court ALLOWS summary judgment to the Corporate Defendants on this claim,

Count IV.

### D.    Wrongful Termination (Count V)

The Corporate Defendants move for summary judgment as to Guilfoile's wrongful

termination claim.   Guilfoile alleges that he was wrongfully terminated in violation of public

policy.   Wrongful termination against public policy is a common law claim under Massachusetts

law. See DeRose v. Putnam Mgmt. Co., 398 Mass. 205, 210 (1986).  In Massachusetts, an at-will

employee can be fired at any time "for almost any reason or for no reason at all."  Wright v.

Shriners Hosp. for Crippled Children, 412 Mass. 469, 472 (1992) (internal citation and quotations

omitted).  Accordingly, to raise a cognizable claim, Guilfoile must show that his discharge falls

within the limited exception prohibiting employers from firing at-will employees "for reasons that violate public policy." Flesner v. Technical Commc'ns Corp., 410 Mass. 805, 810 (1991). Certain grounds for terminating an at-will employee have been deemed categorically unlawful due to public policy. For example, terminating an at-will employee for asserting a protected right (e.g., filing for workers' compensation), refusing to commit an illegal act (e.g., perjury) or for doing what the law requires (e.g., serving on a jury) violates public policy. Smith-Pfeffer v. Superintendent of the Walter E. Fernald State Sch., 404 Mass. 145, 149-50 (1989).

Guilfoile asserts that he was wrongfully terminated by Defendants in retaliation for and causally connected to his "protected whistleblowing." D. 80 at 28. A cause of action for wrongful termination in violation of public policy, however, is inapplicable where "there is a comprehensive remedial statute, [and] the creation of a new common law action based on the public policy expressed in that statute would interfere with that remedial scheme." Perez v. Greater New Bedford Voc. Tech. Sch. Dist., 988 F. Supp. 2d 105, 113 (D. Mass. 2013) (quoting Melley v. Gillette Corp., 19 Mass. App. Ct. 511, 513 (1985)), aff'd, 397 Mass. 1004 (1986)) (internal quotation marks omitted). Here, the FCA is the operative "comprehensive remedial statute." Id. Moreover, Guilfoile's "common law claim not only invokes the same public policy established by [the FCA], it arises from the very acts giving rise to [his] federal claim." Dineen v. Dorchester House Multi-Serv. Ctr., Inc., No. 13-cv-12200-LTS, 2014 WL 458188, at *4 (D. Mass. Feb. 3, 2014). Where, as here, "the federal statute provides a remedy . . . for termination [the] public policy exception . . . is not called into play." Id. Thus, to the extent that the common law wrongful termination claim upon based on Guilfoile's claim related to violation of the FCA, Corporate Defendants are entitled to summary judgment on same. See Valerio v. Putnam Assocs., Inc., 173

F.3d 35, 46 (1st Cir. 1999) (noting that there is "no common law cause of action where the relevant public policy has already been vindicated by a state or federal statute").

Alternatively, to the extent that Guilfoile's wrongful termination claim is based upon fraud on shareholders, such claim also fails as same does not fall within the purview of the public policy exception as it relates to internal policy.  Guilfoile asserts that he approached the Corporate Defendant's director of business development, Robbie Greenglass ("Greenglass") about Shields diverting company resources "for his own personal gain" and "defrauding investors to whom he owed a fiduciary duty."  D. 161 ¶¶ 91-92.  Defendants dispute this fact, and yet still contend, and this Court agrees, that even assuming that it was true, same would still not "give rise to a claim for wrongful termination against public policy," D. 143 at 32, because it relates to "a purely internal corporate matter implicating [company] policies, and Massachusetts law dictates that internal matters do not implicate public policy."  Id.; see King v. Driscoll, 418 Mass. 576, 583 (1994) (noting that "the internal administration, policy, functioning and other matters of an organization cannot be the basis for a public policy exception").  Similarly, any wrongful termination claim premised on the use of the call centers and whether they were in fact meant to be staffed "24/7" also does not give rise to a wrongful termination claim under the public policy exception. Although Guilfoile mentions that the alleged misuse or misadministration of the call centers presents a public health issue, he does not specifically cite to any particular policy or statutory basis for this claim.  At best, the dispute regarding the call center leverages on language used in a contract and application of same.  With no further evidence, such contractual obligations do not implicate public policy for the purposes of a claim for wrongful termination.  Wright v. Shriners Hosp., 412 Mass. 469, 474-75 (1992) (ruling that "we have never held that a regulation governing a particular profession is a source of well-defined public policy sufficient to modify the general

at-will employment rule").  Guilfoile has not shown that the call center claim vindicated any well-defined public policy as required for his wrongful termination claim.  Id.  For all of these reasons, the Court ALLOWS summary judgment as to Count V to the Corporate Defendants.

### E.   **Claims Brought Against Shields (Counts VI and VII)**

#### 1.   *Breach of Fiduciary Duty*

Guilfoile alleges that because he and Shields held shares in the same closely held corporations and Shields owed him a fiduciary duty. D. 80 at 29.  He further alleges that Shields breached these duties by "engaging in potentially illegal conduct, fraudulently diverting corporate resources, and terminating [him] without warning." Id.  To prevail on this claim in a closely held corporation, Guilfoile must prove (1) the closely held nature of the entity; (2) the definition and identity of the fiduciary duty or duties implicated, (3) the defendant breached the duty or duties, and (4) he was injured by it.  Donahue v. Rodd Electrotype Co. of New Eng., 367 Mass. 578, 585-604 (1975).  Even assuming that Shields had a fiduciary duty to Guilfoile, he has failed to show that Shields has breached that duty.  As discussed above, Guilfoile has not shown he was retaliated against in violation of the FCA or that he was wrongfully terminated in violation of public policy. As to Guilfoile's contention that Shields was defrauding shareholders by diverting corporate resources or engaging potentially illegal conduct, Guilfoile does not have a right of recovery to same via this suit.  If Shields was in fact diverting Corporate Defendants' assets, the wrong is inflicted on the corporation itself, and recovery is to be sought in a derivative action on behalf of the company in a derivative action, not by an individual shareholder.  Bessette v. Bessette, 385 Mass. 806, 809-10 (1982).  Accordingly, this Court ALLOWS summary judgment to Shields as to the breach of fiduciary duty claim.

2.      *Intentional Interference (Count VII)*

Guilfoile also asserts a claim for intentional interference with advantageous contractual/business/employment relationships. To prevail on such claim, a plaintiff must prove that "(1) he had an advantageous relationship with a third party (e.g., a present or prospective contract or employment relationship); (2) the defendant knowingly induced a breaking of that relationship, (3) the defendant's interference with the relationship, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions." Weber v. Community Teamwork, Inc., 434 Mass. 761, 781 (2001).  As an initial matter, there can be no interference with a contract if a defendant is a party to a contract or indistinguishable from a party to the contract.  Guilfoile must "show that the defendant [Shields] was not a party to the employment contract, as '[a] party to the contract cannot be held liable for intentional interference.'" Bradley v. Cruz, No. 1:13-cv-12927, 2014 WL 5529316, at *1 (D. Mass. Aug. 10, 2017) (quoting Harrison v. NetCentric Corp., 433 Mass. 465, 477 (2001)).  Even as Guilfoile contends, he agreed to employment with Shields Pharmacy through Shields who made the decision to terminated him from that employment and, thus, Guilfoile cannot bring an interference claims against Shields.  See Harrison, 433 Mass. at 477-78 (noting that where the defendant and the party to the contract are indistinguishable, a claim for tortious interference is not permitted).  Even if Shields was distinguishable from the party to the agreement, Guilfoile's claim still fails since he has not shown interference by improper motive or means. See Blackstone v. Cashman, 448 Mass. 255, 261 (2007).  Accordingly, Shields is entitled to summary judgment as to the intentional interference claim.

F.     **Wage Act (Count VIII)**

Defendants move for summary judgment on Count VIII for violation of the Wage Act, Mass. Gen. L. c. 149 § 148.   "The purpose of the Wage Act is 'to prevent the unreasonable detention of wages.'"  Melia v. Zenhire, Inc., 462 Mass. 164, 170 (2012) (internal citation omitted). The undisputed facts in this case demonstrate that Guilfoile did not go without payment nor were his wages unreasonably detained.   He received a December 24, 2015 final paycheck for wages for December 13-26, 2015 including for four days that he claims he was owed.  D. 145 at 35 (citing record).  A week later, on December 30, 2015, he received a check for the equivalent of seven days pay including four work days between December 28, 2015 and December 31, 2015 and accrued, but unused vacation days.  Id.  Even by Guilfoile's own accounting, this pay exceeded what he was owed.  Id.  Further, the uncontested declaration of Ann Maloney ("Maloney"), the director of Human Resources makes clear that Guilfoile was paid at least the amount which he claims to be owed.  D. 161-15.  Given this undisputed record, this Court ALLOWS Defendants' summary judgment motion as it pertains to the Wage Act claim.

G.     **Claims Against UMSP**

1.     *Breach of Contract Claim (Count I) and Declaratory Judgment Claim
       (Count II) Fail as a Matter of Law*

UMSP separately moves for summary judgment in its favor as to the breach of contract claim as Guilfoile did not have a contract with or own any equity in UMSP.  D. 143 at 40.  As aforementioned, a breach of contract claim requires Guilfoile to first show that a valid contract existed between him and UMSP.  Further, "[i]t goes without saying that a contract cannot bind a nonparty."  EEOC v. Waffle House, Inc., 524 U.S. 279, 294 (2002).  To the extent Guilfoile relies upon the term sheet as the operative contract, UMSP was not a party to it.  In fact, the record does not reflect any instance of Guilfoile entering into agreement with UMSP, meaning they cannot be

held liable for breach of contract having never entered one with him.  See Platten v. HG Bermuda Exempted Ltd., 437 F.3d 118, 129 (1st Cir. 2006) (noting that defendants not parties to an agreement cannot be held liable for breach of contract).  To the extent that Guilfoile relies on equity he potentially owned in UMSP as damages, he admits that he held equity in Shields Pharmacy, one of UMSP's members, not in UMSP itself.  D. 161 ¶ 10.  Accordingly, UMSP is entitled to summary judgment as to the breach of contract claim.  Because the declaratory judgment claim as to UMSP  is premised on a declaration regarding Guilfoile's ownership equity, UMSP is also entitled to summary judgment as to same, Count II,  since Guilfoile did not in fact own equity in UMSP.

### 2. Breach of Covenant of Good Faith and Fair Dealing Claim  (Count III) Fails

Relatedly, UMSP is entitled to summary judgment as to the claim concerning the covenant of good faith and fair dealing.  "Every contract implies good faith and fair dealing between the parties."  T.W. Nickerson Inc. v. Fleet Nat'l Bank, 456 Mass. 562 569-70 (2010) (citation omitted).  As discussed above, UMSP was not a party to any contract with Guilfoile so the absence of same does not give rise to the implied covenant of good faith and fair dealing implicit in every contract under Massachusetts law.  To the extent that Guilfoile asserts a Fortune claim against UMSP (i.e., alleging termination to deprive an employee of benefits any pay due and forthcoming at the time of discharge, Fortune v. Nat'l Cash Register Co., 373 Mass. 96, 104-05 (1977)) or a Gram claim (i.e., alleging termination without good cause to deprive the employee of clearly identifiable future compensation for past services, Gram v. Liberty Mut. Ins. Co., 391 Mass. 333, 335-36 (1984)), both such claims against UMSP fail.  Even as alleged by Guilfoile, his termination was in retaliation for FCA claim, not for the purpose of depriving him of benefits or compensation as required under Fortune/Gram.  Scudder Invs., Inc.. 66 Mass. App. Ct. 610, 618-19 (2006).  To the

extent that Guilfoile was pleading such claim in the alternative, it also fails because, as discussed above, it is undisputed that any agreement with Guilfoile was not with UMSP and Guilfoile has no equity in UMSP.   Accordingly, even assuming *arguendo* that he had grounds for a Fortune/Gram claim, such claim does not lie against UMSP.

### H.   Abuse of Process Counterclaim

Guilfoile seeks summary judgment on Shields' abuse of process claim.  To prevail on an abuse of process claim, Shields would need to demonstrate "that process was used, for an ulterior or illegitimate purpose, resulting in damage."  Psy-Ed Corp v. Klein, 459 Mass. 697, 714 (2011) (citation and quotations omitted).  The ulterior motive, however, must also be "more than an intent to harass; there must be intention to use the process for coercion or harassment to obtain something not properly part of the suit."   Broadway Mgmt. Servs., Ltd. v. Cullinet Software, Inc., 652 F. Supp. 1501, 1503 (D. Mass. 1987).  Here, there are disputed issues of fact as to whether Guilfoile used process for ulterior or illegitimate purpose.  Here, the process alleged is the filing of this lawsuit.  Even if the bulk of evidence of ulterior motive is circumstantial evidence, such evidence would suffice.  Vittands v. Sudduth, 49 Mass. App. Ct. 401, 406 (2000).  Around the time of the filing of his lawsuit, Guilfoile contacted the boards of the Corporate Defendants alleging illegal retaliation and disseminated a press release nationally, targeting two Massachusetts cites where it was more likely to be read by employees and potential clients.  Although these facts were alleged by the Corporate Defendants in the counterclaim, see Guilfoile v. Shields Pharmacy, LLC, 2020 WL 291368, at *4 (Jan. 21, 2020),  there is now a factual record of same, even if disputed by Guilfoile.  All is evidence that bears upon whether Guilfoile filed the lawsuit with an ulterior motive "separate and apart from the remedies properly sought in his lawsuit, " id.; D. 164 at 27-28 (citing record).  Lastly, as to the last element, injury to Shields, even putting aside whether

emotional distress damages are available to Shields, the injury for such claim may be reputational injury and there was sufficient evidence from Shields as to that injury.  D. 164 at 29 (citing record). Accordingly, the Court DENIES Guilfoile's motion for summary judgment as to the abuse of process counterclaim.

## VI.     Conclusion

For the reasons discussed above, the Court ALLOWS the motions for summary judgment for Defendants as to the measure of damages for breach of contract (Count I), declaratory judgment (Count II), FCA retaliation (Count IV), wrongful termination (Count V), breach of fiduciary duty (Count VI), intentional interference (Count VII) and violation of the Wage Act (Count VIII), D. 142, DENIES the motion for summary judgment for Guilfoile as to breach of contract (Count I), declaratory judgment (Count II), FCA retaliation (Count IV), the Wage Act claim (Count VIII) and the abuse of process counterclaim. D. 146.  As to UMSP, the Court ALLOWS summary judgment as to the breach of contract (Count I), declaratory judgment (Count II) and breach of the implied covenant of good faith and fair dealing (Count III).  Accordingly, the breach of contract claim (Count I) and breach of the implied covenant of good faith and fair dealing claim (Count III) against the Corporate Defendants except UMSP and the counterclaim for abuse of process against Guilfoile are the claims that remain for trial.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge